[Cite as *State v. Groves*, 2022-Ohio-443.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellee,            : CASE NO. 20CA3904

    v.                              :

JESSICA GROVES,                         : DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.           :

_____

APPEARANCES:

Valerie Webb, Portsmouth, Ohio for appellant.[1]

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay S.
Willis, Assistant Scioto County Prosecuting Attorney, Portsmouth,
Ohio, for appellee.

CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:2-8-22
ABELE, J.

{¶1} This is an appeal from a Scioto County Common Pleas Court
judgment of conviction and sentence. A jury found Jessica Groves,
defendant below and appellant herein, guilty of (1) aggravated
murder, (2) murder, (3) kidnapping, (4) child endangerment, (5)
tampering with evidence, (6) interference with custody, (7) gross
abuse of a corpse, and (8) four counts of felonious assault.

_____

[1] Different counsel represented appellant during the trial

{¶2}    Appellant raises the following assignment of error for review:

> "APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF
> COUNSEL DUE TO HER TRIAL COUNSEL ABDICATING HIS
> ROLE AS HER ADVOCATE AS WELL AS COMMITTING A
> SERIES OF BAFFLING ACTS AND/OR OMISSIONS DURING
> THE LITIGATION AND TRIAL OF APPELLANT'S CASE."

{¶3}    On June 14, 2019, a Scioto County Grand Jury returned an indictment that charged appellant with multiple, serious felony offenses.[2]  Daniel Groves, appellant's spouse and co-defendant, pleaded not guilty to a similar list of charges on June 17, 2019. Appellant initially pleaded not guilty by reason of insanity, but after the trial court found appellant competent to stand trial, on September 24, 2019 appellant entered not guilty pleas.

---

court proceedings.

[2]The Scioto County Grand Jury returned an indictment that contained the following eleven counts: Count 1 - aggravated murder, in violation of R.C. 2903.01(C), an unspecified felony; Count 2 - murder, in violation of R.C. 2903.02(B), an unspecified felony; Count 3 - kidnapping, in violation of R.C.2905.01(A)(5), a first-degree felony; Count 4 - endangering children, in violation of R.C. 2919.22(A), a third-degree felony; Count 5 - tampering with evidence, in violation of R.C. 2921.12(A)(1), a third-degree felony; Count 6 - interference with custody, in violation of R.C. 2919.23(A)(1), a fourth-degree felony; Count 7 - gross abuse of a corpse, in violation of R.C. 2927.01(B), a fifth-degree felony; Count 8 - felonious assault, in violation of R.C. 2903.11(A)(1), a second-degree felony; Count 9 - felonious assault, in violation of R. 2903.11(A)(1), a second-degree felony; Count 10 - felonious assault, in violation of R.C. 2903.11(A)(1), a second-degree felony; and Count 11 - felonious assault, in violation of R.C. 2903.11(A)(1), a second-degree felony.

{¶4}    On January 6, 2020, a five-day joint jury trial began with both co-defendants present.  Registered Nurse Darienne Liles worked at Southern Ohio Medical Center (SOMC) on January 10, 2019 when appellant and Daniel Groves (hereinafter Groves) arrived at the hospital at 5:25 a.m.  Liles testified that appellant appeared to be "flat, disconnected and uncooperative," refused to provide a urine sample, and refused to answer questions about prenatal care.  Appellant was completely dilated, but "not in pain, * * * very unusual for somebody who we've not administered pain medicine to."  Moments before the baby's birth, Groves stated that appellant "had used heroin two days ago."

{¶5}    SOMC staff eventually obtained appellant's urine sample that tested positive for amphetamines.  Approximately 30 minutes after appellant entered the hospital, she delivered Baby Dylan (Dylan).  Nurse Liles testified that Groves "seemed worried and almost afraid."  "Whenever we were questioning her they were both just making * * * eye contact with each other, not acting like they were paying much attention to us."  "The only thing [Groves] said was that she [appellant] had used heroin that she was always too high to go to her prenatal care visits." * * * "[W]e thought he was almost looking to [appellant] for permission to answer our questions.  I could feel a couple of times he wanted to say things or answer and he did not."  Liles testified that neither appellant

nor Groves requested to see Dylan after his birth.

{¶6}   Registered Nurse Tori Howell cares for newborns in the SOMC nursery.  Howell testified that because Dylan, born approximately one month early, had difficulty breathing, they removed him to the nursery.  Howell also testified that (1) Dylan's preliminary screen showed "unconfirmed positive" for amphetamines, and (2) the umbilical cord tested positive for amphetamines, methamphetamines, fentanyl, opiates, and morphine.  Howell further testified that, while Dylan was in the nursery for several days, Groves visited once and neither parent asked about Dylan's condition.

{¶7}   SOMC Obstetrician-Gynecologist Dr. Darren Adams was on call when appellant and Groves arrived at the hospital.  The hospital called Dr. Adams because appellant had no prenatal care and was ready to deliver.  When Dr. Adams arrived, appellant, dilated at nine and one-half centimeters, appeared distant and did not answer questions.  Dr. Adams believed appellant might have been impaired because, typically, a mother that far dilated with no pain medication would be in extreme pain.  Appellant, however, "was just distant, an - - an odd reaction."  Dr. Adams delivered Dylan within minutes and he weighed 5 pounds, 10 ounces, and was 19 inches long.  Later that day, Dr. Adams returned to care for appellant's postpartum hemorrhage.

{¶8}   Assistant Nurse Manager Stacey Riffitt testified appellant kept Dylan for 15 minutes after his birth, but "didn't hold him.  She didn't ask how his condition was.  She just said, 'Put him there on the wall.'"  Also, Dylan was diagnosed with neonatal abstinence syndrome, meaning that he had been exposed to drugs in utero and was in withdrawal.  Dylan had tremors, could not quiet himself, and needed to be comforted.  Riffitt explained that the umbilical cord test shows "every substance the mother used from 20 weeks gestation on."  Riffitt also testified that Dylan required an oxygen treatment immediately after birth, but they weaned him from the oxygen treatment within 90 minutes and he was otherwise "very healthy" with no injuries.

{¶9}   When Nurse Riffitt spoke with Groves in appellant's hospital room, Daniel Groves told Riffitt he had "just talked with the physician and asked if meth could be found in heroin."  Groves also told Riffitt that appellant is a nurse who used heroin and, after she learned of her pregnancy, she continued to use heroin, "enough to keep the withdrawal symptoms from happening to her." Riffitt returned to the room and Groves' eyes "looked a little more glassy.  He would not make eye contact with me.  His speech was slow."  Riffitt believed Groves was under the influence of something.  Riffitt further testified that, after Dylan stayed at the hospital for five days to monitor drug withdrawal symptoms, the

hospital discharged Dylan to Scioto County Children's Services (SCCS).

{¶10} SOMC Social Worker Christine Procter Frantz testified that Dylan's initial discharge plan permitted him to go home with Daniel Groves due to Groves' negative drug screen, and because he told SCCS that he did not know about appellant's drug use during pregnancy. Frantz also stated that, although SCCS considered the unconfirmed positive drug screen not to be a true positive, the hospital disagreed and sought to keep Dylan until they received the umbilical cord test results "because with mom and baby both being positive it should be an automatic removal."

{¶11} SOMC Social Work Services Manager Mandy Burchett testified that, after the hospital received the cord toxicology results on January 15, 2019, Dylan would be discharged to foster care.

{¶12} On January 16, 2019, SCCS filed a complaint in the juvenile court and alleged Dylan (age six days), and appellant's other child, Daniel, Jr., (age 14), to be abused, neglected and dependent. SCCS also sought an ex parte order to place Dylan in SCCS custody and Daniel Jr. under an order of protective supervision.

{¶13} On January 16, 2019, the juvenile court awarded Dylan's custody to SCCS and, on January 28, 2019, the court further

ordered: (1) the children remain in SCCS custody, (2) appellant complete a drug abuse evaluation and follow all recommendations, and (3) appellant report to juvenile court and complete an assessment to participate in the Family Reunification Court.

{¶14} After foster parent and elementary school teacher Andrea Bowling received a call to ask her to foster parent a drug-dependent infant, she took physical custody of Dylan. Bowling observed Dylan's tremors, sweats and his desire to be held at all times. Also, during visitation with Dylan's parents at SCCS, Bowling believed a "possibility that [appellant] was under the influence of something." When Dylan reunited with his parents on January 28, 2019, Bowling gave the parents diapers, supplies and a letter with Bowling's contact information and statement that she would be available if the parents needed anything. After the family visitation, Bowling also called SCCS about her concerns with appellant's demeanor.

{¶15} Scioto County Help Me Grow Service Coordinator Stephanie Jenkins administers an Early Intervention Program. In this program, staff will (1) conduct home visits to screen and monitor a child's progress, (2) assist parents to understand developmental milestones, (3) work directly with children, and (4) refer a family to other programs including WIC, Head Start, medical cards, food stamps, therapies, and transportation. After Jenkins received a

January 25, 2019 referral, she made multiple attempts, from January to March, to contact Dylan's parents. However, on March 11, 2019 Help Me Grow terminated appellant and Groves from the program because of their lack of a response.

{¶16} SCCS Caseworker Patricia Craft, who served as Dylan's caseworker, testified that, after Dylan's removal from Groves' custody and the juvenile court's emergency order that awarded custody to SCCS, foster parent Andrea Bowling took physical custody of Dylan. A safety plan identified appellant's substance abuse as a threat, and required appellant to (1) sign a release form, (2) obtain a drug and alcohol assessment, (3) submit to weekly contact and drug treatment, (4) remain outside the home unless supervised, and (5) submit to supervised visits.

{¶17} Caseworker Craft testified that she first met Dylan's parents on January 25, 2019 at a family team meeting. Participants at the meeting included Caseworker Johnson, Andrea Bowling, Craft, appellant and Daniel Groves. SCCS informed both parents that they should complete drug and alcohol assessments, participate in individual counseling, and comply with court orders. Groves also told Craft that he had a six-month leave from his employment at Rural King. Immediately after the team meeting, the parents had a one-hour visit with Dylan. Afterward, Bowling told Craft that she thought appellant was "loopy" and "on drugs." At that time Daniel,

Jr. remained in Groves' custody.

**{¶18}** Caseworker Craft further explained that, because Groves had no violent criminal history and no prior SCCS involvement, SCCS policy provided that Dylan should be returned to Groves if he could successfully pass another drug screen. Interestingly, although Groves' screen did test clean, neither Craft nor anyone else directly observed Groves during the drug screen process.

**{¶19}** SCCS returned Dylan to Daniel Groves on January 28, 2019. At the February 4, 2019 home visit, Caseworker Craft observed that Dylan appeared to be quiet and exhibited no visible injuries. Additionally, appellant was in treatment and SCCS required her to attend treatment "until further notice" and to continue to report to drug court.

**{¶20}** Between February 4 and 21, 2019, Caseworker Craft made multiple unsuccessful phone attempts to contact Daniel Groves. Craft and another caseworker also visited Groves' home, but found no one. Craft then visited Daniel, Jr.'s school and gave him a note to ask Groves to call Craft. Craft also left notes in Groves' door and mailbox, and, on February 21, 2019, Craft visited Groves' residence. During this attempted visit, Craft observed Daniel, Jr. exit his school bus and enter the home. Craft also noticed two dogs and a chain with a "No Trespassing" sign, but did not see cars. The next day, Craft again returned to Groves' home, but did

not see cars.

{¶21}  On February 25, 2019, Caseworker Craft completed her monthly home visit and observed that Dylan appeared to be clean, appropriately dressed and displayed no visible injuries.  According to Groves, Dylan had recently visited the doctor and weighed 8 pounds, 9 ounces, and was 22 inches long.  Groves also told Craft that appellant stayed at the residence only during the day, but Craft could not verify this information.

{¶22}  At the time of the next monthly scheduled home visit on March 18, 2019, Groves told Caseworker Craft that he was in Canton visiting his ill father.  At the rescheduled March 21, 2019 visit, Craft found no one home.  After she returned to her office, Craft received voicemail from Groves that said he was in Canton with his father.

{¶23}  At the March 27, 2019 juvenile court hearing, appellant appeared but Groves did not.  The juvenile court adjudicated the children to be abused, neglected and dependent, pointed out that appellant did not complete the drug treatment program, and concluded that Dylan's best interests required him to remain in SCCS custody pending disposition.

{¶24}  At the March 28, 2019 home visit, Caseworker Craft interacted with Groves, appellant and Dylan.  Although Craft did not inquire why Groves did not attend the March 27, 2019

adjudication, she did observe appellant feed Dylan.  Also, Craft did not observe any injuries to Dylan.  When both parents told Craft that they had kept all appointments and asked whether appellant could return home, Craft said she would ask her supervisor.  Craft also reminded them about the April 3, 2019 court hearing and her next home visit on April 9, 2019.

{¶25}  On April 3, 2019, Groves texted Caseworker Craft and said that, although he and appellant had been ill, they drove to Canton to visit Groves' father when their car broke down and they became stranded.  On April 17, 2019, Craft unsuccessfully attempted to inform Groves that the guardian ad litem wanted to visit their home and that Craft's next home visit would be April 24, 2019.  At this point, because Groves had texted Craft from four different numbers, she and the guardian ad litem attempted to contact Groves at all four numbers.  Further, Craft learned that, since February 8, 2019, appellant had not complied with her individual therapy visits and she last attended a group session on March 26, 2019.

{¶26}  At the April 18, 2019 juvenile court hearing, Groves' attorney, appellant's attorney, Caseworker Craft and the SCCS attorney all attended, but appellant and Groves did not.  At the conclusion of the hearing, the juvenile court ordered Dylan to remain with SCCS.

{¶27} On April 19, 2019, Caseworker Craft again visited Groves' home, knocked on the door for several minutes, then left cards in the door and mailbox that asked Groves to call.  Craft also contacted Rural King because she thought Groves could be at work, but Rural King informed her that Groves quit his job in 2018.  That same day, Groves texted Craft and said he was still "up north" and a friend watches his home when he is away.  Groves also told Craft that Dylan was "doing great.  Growing like a weed.  LOL."  Because of car trouble, Groves said his uncle could bring him home Monday or Tuesday and he would contact Craft.

{¶28} Caseworker Craft continued to attempt to contact Dylan's parents on April 19, 22, 23, and 24, 2019.  Craft then visited school to talk with Daniel, Jr., who appeared to be nervous, but told her Dylan was fine.  When Craft asked if appellant stayed at their home, first Daniel, Jr. said, "yes," then he said "occasionally."  When asked about his ill grandfather in Canton, Daniel, Jr. replied, "Who was that?"

{¶29} On April 24, 2019, SCCS took custody of Daniel, Jr. and placed him with an aunt and uncle.  Shortly thereafter, Caseworker Craft received Groves' text that asked why Daniel, Jr. did not come home from school.  Craft then visited Groves' home and, because of parked cars assumed everyone to be home, but received no answer.  Craft then texted Groves to tell him to bring Dylan, along with the

children's personal items, to the agency the next day.  Groves said he would do so, but did not.  On April 25, 2019, the juvenile court continued protective supervision of Daniel, Jr., and continued Dylan's temporary custody with SCCS.

{¶30}  On April 30, 2019, Caseworker Craft filed a missing person report with the Scioto County Sheriff's Department.  Craft continued to communicate with Groves and, on May 3, 2019, visited the residence, along with another caseworker and a deputy sheriff. On May 7, 2019, Craft returned to the residence and observed all vehicles present.  On May 15, 2019, SCCS visited the residence and noted one missing vehicle.  On May 23, 31, and June 7, 2019, SCCS attempted additional home visits, but to no avail.  Craft also testified that other agencies, including the juvenile court and Care Source, searched for Groves.

{¶31}  On June 10, 2019, Caseworker Craft learned that law enforcement had arrested both Groves and appellant and "Jessica and Daniel was [sic.] telling them that I came several months ago and took the child."  Craft, however, testified that she last observed Dylan on March 28, 2019.  Craft also conceded on cross-examination that SCCS did not issue an Amber Alert because a supervisor believed that, if an Amber Alert goes out, it "would give a bad reputation for the agency because we lost a child."

{¶32} Pediatrician Dr. Mohammad Ali first observed Dylan at the hospital soon after his birth, then a few times at his office. Dr. Ali testified that Dylan stayed at the hospital longer than normal due to drug withdrawal symptoms. On January 16, 2019, Dr. Ali observed Dylan in his office for a well-newborn check, and Dylan's foster parent informed him that Dylan sneezed, perspired excessively, had tremors, but otherwise appeared to be well. Dr. Ali learned about the abnormal newborn 17-hydroxy progesterone screening, that indicated elevated risk for congenital adrenal hyperplasia, but Dylan's care transferred to a different pediatric practice and miscommunication occurred about whether the screening had been repeated. Dr. Ali also testified that, although he did not know whether the screening had been repeated, this abnormality would not cause bone fractures, bruising or swelling of the head.

{¶33} Christ Care Pediatrics Pediatrician Dr. Gregory Hudson testified he first observed Dylan on February 7, 2019. Dr. Hudson discussed the abnormal 17-hydroxy progesterone screening and ordered additional lab work to recheck the abnormal panel. As instructed, appellant and Groves returned to Dr. Hudson's office on February 21, 2019 when Dr. Hudson learned that Groves had completed all but one lab test. Because Dr. Hudson was not the attending pediatrician at Dylan's birth, and because he did not know that the

hospital had completed a 17-hydroxy progesterone test, Dr. Hudson ordered another test.  Additionally, although Dylan exhibited no injuries at his February 21, 2019 office visit, he weighed on the low end of normal.  Consequently, Dr. Hudson scheduled a March 7, 2019 return visit.  Groves, however, did not return with Dylan.

**{¶34}**  Dr. Hudson further explained that, due to the testing mix-up, his office sent two letters to appellant to stress the importance of another test and threatened that, if appellant did not repeat the screening, "they will involve Children's Protective Services."  In addition to the letters, Dr. Hudson's office called Groves and appellant, but received no response.  Dr. Hudson further testified that in his 30 years of experience, he had never seen a two-to-three month old baby fracture his own skull, ribs, arms or legs.

**{¶35}**  Mahajan Therapeutics Therapist Jessica Byrd testified that SCCS referred appellant to their facility for assessment and treatment.  Appellant completed her drug and mental health assessments on January 18, 2019, attended an individual therapy session on February 8, 2019 and submitted to several supervised drug screens.  However, after February 8, 2019, appellant became "very inconsistent and eventually then just totally stopped coming."  Byrd also contacted SCCS on February 14, 15, 22, 27,

March 1, and April 2, 2019 about appellant's noncompliance.

Apparently, appellant attended one group counseling session on

March 26, 2019, but Byrd said she was "a little bit different. * *

* she was very defensive.  It seemed like she was edgy, a little

angry, just upset that Children's Services like wasn't letting her

husband just be with the baby."  Byrd also suspected appellant was

under the influence of drugs or alcohol at her March 26, 2019

session.

{¶36}  Scioto County Juvenile Court Intake Officer and

Investigator Greg Dunham testified that, after SCCS removed Dylan,

the juvenile court ordered appellant to report to Dunham twice per

month.  Dunham met with appellant on January 24, 2019, reviewed her

requirements and completed a drug court assessment.  Appellant,

however, missed three report dates and did not appear until March

28, 2019 when she told Dunham she missed appointments because she

had no transportation.  Dunham also visited appellant's residence

on May 31, June 3, June 4, June 5, and June 10, 2019, but could not

locate appellant.

{¶37}  Scioto County Sheriff's Captain John Murphy visited the

Groves home on May 20, 2019 and attempted to locate Dylan, but the

driveway had been "cabled off" with motion detectors.  Murphy did

hear dogs inside the home, but he did not see anyone.  When Murphy

began to leave, he spoke with a neighbor who told him that "they [the Groves] leave early morning hours and they come back late at night. They're usually on a four-wheeler riding up and down the roadway." During this conversation, Murphy observed appellant and Groves riding atop a four-wheeler. Murphy attempted to stop them, but Groves "took off through a field and I gave chase through the grassy field, and they hit the woods and we could not pursue any further."

{¶38} Scioto County Sheriff's Detective Adam Giles testified he secured a search warrant on June 10, 2019 and visited the Groves home, along with other officers. After officers surrounded the home, they knocked on the door and asked the occupants to exit. Approximately 15 to 20 minutes later, appellant exited, screamed, cursed and informed officers that SCCS had already taken Dylan. Appellant would not, however, answer whether Groves remained inside the home. When Groves did not exit, officers sent a robot into the home. Eventually, officers apprehended Groves and he told them he had "been asleep the whole time." When Giles asked about Dylan, Groves said SCCS had already taken him.

{¶39} Otway Volunteer Fire Department firefighters Steven Gambill and Dan Shirey testified that the department used a truck and chain saws to access a logging road to search a well, but the

water level prevented a search.  Instead, they dropped a hook into the well and retrieved two milk crates, connected with a heavy padlocked chain.    Montgomery County Coroner's Office Forensic Pathologist Dr. Susan Brown received Dylan's body in two milk crates, connected with a chain and "three padlocks * * * 12 zip ties, and * * * eight metal wires * * * [and] 18 large rocks." Dylan had been "wrapped in multiple layers of plastic and around all of this plastic is this iron anchor type device."  Dr. Brown testified that Dylan's body exhibited (1) skull fractures (that did not occur simultaneously), (2) bruises on right side of chest and left leg, (3) laceration on left arm, (4) fractures of the left humerus or the upper arm bone * * * and * * * fracture of the left radius and ulna, the bones of the left forearm, (5) fractures of left tibia, and (6) on the sixth rib an "old healing fracture, and the same thing on rib seven next to it, a large nodular area, which is a healing old fracture, left rib six and seven."  The examination further revealed that the rib fractures did not occur at the same time as the other fractures.  Dr. Brown testified that Dylan's "cause of death is homicidal violence of undetermined etiology."  She explained Dylan had been a victim of blunt force trauma, but the "specific cause of death can't be determined because a typical exam could not be performed because his body was

decomposing from being concealed in - - in water for months." Dr. Brown also believed that the fractures showed at least three different traumas. Toxicology reports also detected methamphetamine and amphetamine in Dylan's liver.

**{¶40}** Scioto County Sheriff's Detective Jodi Conkel interviewed appellant after her arrest and described her as "very standoffish, cold, didn't really want to talk to me, kind of annoyed." Appellant told Conkel that SCCS had taken Dylan and Daniel, Jr., and that she did not use illegal drugs. Later that day, Conkel interviewed Groves who also maintained that SCCS had taken Dylan. Conkel said Groves appeared to be "dope sick," which he did admit to Conkel. Groves later told Conkel that he found Dylan in his crib deceased.

**{¶41}** On June 12, 2019, Detective Conkel interviewed appellant and Groves. During this conversation, Groves admitted that SCCS did not take Dylan. The Sheriff's Office also accommodated Groves' request to talk to appellant, and a video recording of their jail conversation revealed additional information:

> DEFENDANT D. GROVES: When they took me out there
> yesterday - - wanted me to take them where he was at, and
> I took them - - some bullshit place because - - don't
> tell them where he is because if they find his body - -
>
> DEFENDANT J. GROVES: (Inaudible).

DEFENDANT D. GROVES: If they find his body and if they find out where he had a broken arm and shit, we're fucked.  It don't matter.

DEFENDANT J. GROVES: They don't know where he's at.  I don't know where he's at.

**{¶42}**  At some point, Groves agreed to take authorities to Dylan's body.  Detective Conkel also testified about a calendar found in the mobile home with a notation "Worse [sic.] day ever" on April 24, 2019, the date SCCS removed Daniel, Jr.

**{¶43}**  Daniel, Jr., the co-defendants' 15-year old son, testified he first found out about appellant's pregnancy "somewhere around in November" 2018.  Before his April 24, 2019 removal from the home, Daniel, Jr. observed bruising and swelling on Dylan's head, and, when he asked his parents what happened, Groves told him "about him getting a - - like a dream catcher stuck within his arm and him swinging a small tiny stone up to his head.  I'm not sure if that caused the injury - - the swelling of his head.  I don't believe it was."  Daniel, Jr. also testified that every couple of months, he provided his urine to Groves, both before and after Dylan's birth, and Groves then put the urine in a capped lid bottle.

**{¶44}**  At the close of the state's case-in-chief, the trial court conducted a lengthy and thorough discussion with the co-defendants and informed them about their right to testify or not to

testify, and the consequences of either choice, including cross-

examination about prior criminal offenses.  After both co-

defendants informed the court that they wished to testify,

appellant testified as follows:

> Q [Jessica's Counsel Mr. Stratton]: Jessica, did you, and
> you only, cause the death of your son, Dylan Groves?
>
> A: Yes.
>
> Q: Did Daniel Groves participate in the killing of Dylan?
>
> A: No.
>
> Q: Was Daniel Groves aware of any of the injuries that
> you caused Dylan that may have led to his death?
>
> A: No.
>
> Q: Did you hide all the injuries that you caused Dylan
> from your husband?
> A: Yes.
>
> * * *
>
> Q: Jessica Groves, the injuries that Dylan sustained
> happened on what date?
>
> A: On March 27th.
>
> Q: Dylan died on what date?
>
> A: March 28th.
>
> * * *
>
> Q: Where did you take Dylan after he died?
>
> A: He was at our house for a couple days.
>
> Q: And then where did you take him?

A: To the well.

Q: Did you murder Dylan Groves?

A: Not intentionally.

{¶45}  On cross-examination, the state asked appellant how she caused Dylan's death, to which she replied, "[i]t was an accident." When asked about the rib fractures, appellant replied, "by dropping him."  When asked about the skull fracture, appellant said, "I don't remember. * * * It had to be from dropping him."  When asked about the upper arm fracture, appellant replied "Nothing that I ever did was intentional. * * * I have to live with this for the rest of my life. * * *  You have devoured my family."  When pressed for details about how she caused Dylan's death, appellant told the prosecutor, "I've admitted to my guilt. * * * And I have to live without - - my children. * * *  I'm done talking to you."  At that point, the trial court admonished appellant that she must submit to cross-examination or her testimony would be stricken.  Appellant then responded to most questions "I don't remember."  Eventually, appellant did state that she did not have a clear mind "because of drugs," and that Groves, her co-defendant, participated only in the preparation and concealment of Dylan's body.

{¶46}  After Groves testified about his prior shoplifting conviction, he addressed the facts in the case at bar and stated

that appellant first told him about her pregnancy in October or November 2019.  About five minutes into their trip to the hospital for Dylan's birth, appellant also told Groves that "she had been using drugs and that she had not went to her [prenatal] appointments."  According to Groves, he hesitated to answer medical questions at the hospital because he had not processed what he had just learned, and that appellant could be "intimidating."  Groves did say he visited Dylan once in the nursery and inquired about his health.  Groves also claimed he was not impaired while at the hospital, but that he may have given that appearance because he had "been up for over 30 some hours straight."  Additionally, Groves testified that he provided his own urine sample at the hospital, but admitted that, on other occasions, he asked Daniel, Jr. for his urine, but always for a friend to use for drug tests.  Groves explained the reason he did not give his urine to his friend is because he "smoked some marijuana and occasionally would hit - - smoke, you know a little."  Thus, Groves claimed he did not use his son's urine to fake his own drug test.

{¶47}  Groves also testified that he recalled seeing bruises on Dylan's head, but did not see swelling.  Groves believed Dylan's head bruise resulted from an accident with a dream catcher, and that the bruise appeared to be on Dylan's forehead, not all around

his head.  Groves testified he did not cause Dylan's death and he was not present when Dylan died.  Instead, Groves said he found Dylan deceased in his crib.  Groves also stated that, after appellant told him that because he had custody SCCS would blame him for Dylan's death, he became scared and lied to law enforcement.  Groves did admit, however, that he told Detective Conkel that he had "seen [appellant] hit him probably four times, probably," * * * "because he wouldn't stop crying and because she was so * * * agitated and aggravated and if I brought her coke [cocaine] she wouldn't be that way."  Groves also admitted he told Conkel, "[o]ne time I saw her, she had a hold of him like below his arms. * * * Like by his ribs or something and she just kind of went ahh."  Once again, Groves said he did not tell the truth because he feared "he would get the blame for it completely."

{¶48}  After hearing the evidence, the jury found appellant guilty of: (1) aggravated murder, in violation of R.C. 2903.01(C), an unclassified felony, (2) murder, in violation of R.C. 2903.02(B), an unclassified felony, (3) kidnapping, in violation of R.C. 2905.01(A)(5), a first-degree felony, (4) child endangerment, in violation of R.C. 2919.22(A), a third-degree felony with a serious physical harm specification, (5) tampering with evidence, in violation of R.C. 2921.12(A)(1), a third-degree felony, (6)

interference with custody, in violation of R.C. 2919.23(A)(1), a fourth-degree felony with a physical harm specification, (7) gross abuse of a corpse, in violation of R.C. 2927.01(B), a fifth-degree felony, and (8) four counts of felonious assault, in violation of R.C. 2903.11(A)(1), second-degree felonies.

{¶49} At that point, the trial court: (1) merged Count 1 aggravated murder, Count 2 murder, and Count 11 felonious assault, (2) merged Count 3 kidnapping and Count 6 interference with custody, and (3) merged Count 8 felonious assault and Count 10 felonious assault.

{¶50} For sentencing, the trial court imposed the following prison sentences: (1) life without parole for Count 1 aggravated murder, (2) ten years for Count 3 kidnapping, (3) 36 months for Count 4 endangering children, (4) 36 months for Count 5 tampering with evidence, (5) 12 months for Count 7 gross abuse of a corpse, (6) eight years for Count 8 felonious assault, and (7) eight years for Count 9 felonious assault.  The court also ordered (1) Counts 5 and 7 to be served concurrently, (2) Count 1, 2, 3, 4, 6, 8, 9, 10, and 11 to be served consecutively, and (3) five-year mandatory post-release control.

{¶51} Consequently, the trial court sentenced appellant to serve an aggregate prison term of life without parole, plus an

additional 32 years.  This appeal followed[3].

I.

**{¶52}**  In her sole assignment of error, appellant asserts that

her trial counsel's performance fell below an objective standard of

reasonable performance and representation.  Appellant argues that,

during the trial court proceeding, her counsel abdicated his role

as her advocate and, instead, committed a series of baffling acts

---

[3] Co-defendant Daniel Groves' appellate case number is
20CA3902.  At the conclusion of the trial, the jury found Daniel
Groves not guilty of aggravated murder, but guilty of: (1) murder,
in violation of R.C. 2903.02(B), an unclassified felony, (2)
kidnapping, in violation of R.C. 2905.01(A)(5), a first-degree
felony, (3) child endangerment, in violation of R.C. 2919.22(A), a
third-degree felony with a serious physical harm specification, (4)
tampering with evidence, in violation of R.C. 2921.12(A)(1), a
third-degree felony, (5) interference with custody, in violation of
R.C. 2919.23(A)(1), a fourth-degree felony with a physical harm
specification, (6) gross abuse of a corpse, in violation of R.C.
2927.01(B), a fifth-degree felony, and (7) four counts of felonious
assault, in violation of R.C. 2903.11(A)(2), second-degree
felonies.  The trial court: (1) merged Count 2 murder and Count 11
felonious assault, (2) merged Count 3 kidnapping and Count 6
interference with custody, and (3) merged Count 8 felonious assault
and Count 10 felonious assault.  The court then imposed the
following prison sentence (1) 15 years to life for Count 2 murder,
(2) 10 years for Count 3 kidnapping, (3) 36 months for Count 4
endangering children, (4) 36 months term for Count 5 tampering with
evidence, (5) 12 months for Count 7 gross abuse of a corpse,(6)
eight years for Count 8 felonious assault, (7) eight years for
Count 9 felonious assault.  The court further ordered: (1) the
tampering with evidence and abuse of a corpse sentences to be
served concurrently with each other, (2) the sentences in Counts 2,
3, 4, 6, 8, 9, 10, and 11 to be served consecutively, and (3) a
five year mandatory post-release control.  Thus, the court
sentenced Daniel Groves to serve an aggregate prison term of 47

or omissions.  In particular, appellant contends that, although counsel did act according to appellant's wishes and appellant acknowledged her guilt in order to absolve her co-defendant husband of murder, she would have been in a better position had trial counsel simply not spoken a word during her trial.

## A.  Trial Strategy

{¶53}  Appellant initially asserts that her trial counsel's strategy fell below the realm of legitimate trial strategy. Specifically, appellant argues that her trial counsel "abandoned his role as an advocate for [appellant] and instead acted as another prosecutor in a misguided attempt to pin the blame of Dylan Groves' death on appellant to save her codefendant, Daniel Groves."

{¶54}  The Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, provides that criminal defendants shall have the assistance of counsel for their defense.  The United States Supreme Court has interpreted this provision to mean that a criminal defendant is entitled to the "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶55}  To establish a claim of ineffective assistance of counsel, a defendant must show (1) counsel's deficient performance,

years to life.

and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *Id.* at 687. To establish a deficient performance, a defendant must prove that counsel's performance fell below an objective level of reasonable representation. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. Additionally, courts need not analyze both prongs of the Strickland test if a claim can be resolved under one prong. *See State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000); *State v. Clark*, 4th Dist. Pike No. 02CA684, 2003-Ohio-1707, ¶ 17; *State v. Blair*, 4th Dist. Athens No. 18CA24, 2019-Ohio-2768, ¶ 58; *State v. Bowling,* 4th Dist. Jackson No. 19CA2, 2020-Ohio-813, ¶ 12-13.

{¶56} When a court examines whether counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689, 466 U.S. 668, 104 S.Ct. 2052. Moreover, because a properly licensed attorney is presumed to execute their duties ethically and competently*, State v. Taylor*, 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel'

guaranteed * * * by the Sixth Amendment." *Strickland* at 687, 466 U.S. 668, 104 S.Ct. 2052.

{¶57} In the case sub judice, appellant asserts that her trial counsel provided ineffective legal assistance, but it appears that counsel based his actions on a particular underlying strategy, a strategy to which appellant and her co-defendant husband explicitly agreed.

{¶58} Generally, a defendant has no constitutional right to determine trial tactics and strategy of counsel. *State v. Cowans*, 87 Ohio St.3d 68, 72, 717 N.E.2d 298 (1999); *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 150. Rather, decisions about viable defenses are the exclusive domain of defense counsel, after consultation with the defendant. *Id.; State v. Crank*, 5th Dist. Stark No. 2016CA00042, 2016-Ohio-7203, ¶ 18. "When there is no demonstration counsel failed to research the facts or the law or counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter." *Crank* at ¶ 18, citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

{¶59} At trial, witness presentation, questioning and cross-examination usually falls within the ambit of trial strategy. Debatable trial tactics do not generally establish ineffective

assistance of counsel. *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45. Further, even if the wisdom of an approach is questionable, debatable trial tactics do not constitute ineffective assistance of counsel. *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995).

{¶60} Appellant cites *State v. Burgins*, 44 Ohio App.3d 158, 542 N.E.2d 707 (4th Dist.1988) to support her argument that the events that transpired in the case at bar should not be viewed as appropriate trial strategy. Convicted of theft, Burgins argued he did not receive effective assistance of counsel when, during closing argument, counsel stated that even he did not believe Burgins, and that he expected the jury to find Burgins guilty. This court held that when a defendant's counsel in a criminal case tells the jury that counsel does not believe counsel's own client, and that counsel also expects the jury to return a guilty verdict, the defendant has been denied the effective assistance of counsel. Although defense tactics, and even ineffective defense tactics, are usually not considered grounds for reversal, when such a deviation from the norm occurs that ordinary trial counsel would scoff at hearing of it, a reviewing court may reverse a guilty verdict and order a new trial.

**{¶61}** Appellee, however, points to *State v. May*, 1st Dist. Hamilton No. C-070290, 2008-Ohio-1731. In *May*, the defendant had been charged with both aggravated robbery and robbery, but after counsel stipulated to May's guilt on the robbery charge, the jury found May guilty of robbery, but not guilty of aggravated robbery. On appeal, May argued he received ineffective assistance. The First District held, however, that unlike *Burgins*, nothing in the record suggested that May planned to maintain his innocence. *May* at ¶ 9. Thus, even if May's attorney's stipulations arguably constituted error, because overwhelming evidence of guilt existed, the trial's outcome would not have changed, even absent the stipulations. Consequently, the court concluded that no prejudice occurred. *Id.* at ¶ 10.

**{¶62}** Appellee also points out that in *State v. McGlone*, 4th Dist. Scioto No. 90CA1910, 1992 WL 50021 (Mar.11, 1992), counsel admitted guilt on a minor offense to make more credible his proclamations of innocence on the more serious offenses. Thus, appellee contends that the instant case is more similar to *May* and *McGlone* than *Burgins* because, although appellant's counsel's opening statement admitted her guilt, counsel had "the primary goal of attempting to exonerate Daniel Groves from the Aggravated Murder, Murder, and Felonious Assault counts." Appellee further

points out that this strategy ultimately proved to be successful because the jury did, in fact, find appellant's husband co-defendant not guilty of aggravated murder.  In addition, like *May,* nothing in the record suggests that appellant planned to maintain her innocence.  In fact, appellant openly stated her intention to concede guilt in an attempt to help her husband.

**{¶63}**  As appellee further notes, appellant's trial counsel stated during the December 18, 2019 pretrial: "MR. STRATTON: Your Honor, just as mentioned in chambers, that the one issue that we will address before opening statements at trial.  THE COURT: I will - I'll ask you to remind me of that before - - before we give openings after - - once we have a jury selected."  At the beginning of the trial, appellant's counsel stated, "My client has indicated to me that she intends to testify and that my opening statement and the statements through questioning will have to do with that testifying, and that she wants me to proceed accordingly."

**{¶64}**  Thereafter, the trial court explained to appellant her right to testify or not to testify, the implications of both, and that she could change her mind.  Appellant stated that she understood the trial court's advisements, had consulted with counsel about her wishes, and had no questions:

THE COURT: All right.  Now, early on in this case during some pretrial hearings we had some discussions here in the courtroom about whether to try these cases together or to try them separately.  Do you remember those pretrial hearings we had on that, Ms. Groves?

DEFENDANT J. GROVES: I do.

THE COURT: And we discussed a case here in the courtroom called *Bruton*, which deals with the issues of statements from codefendants in cases, and those statements being offered where they implicate a codefendant where someone doesn't testify.  Do you remember those discussions?

DEFENDANT J. GROVES: I do.

THE COURT: And do you feel like you understood that when we discussed that?

DEFENDANT J. GROVES: Yes, Your Honor.

TRIAL COURT:  Do you understand that if - - if you do testify in this matter, and I can tell you I - - I'm not trying to influence you one way or the other.  This is solely your decision.  But do you understand that if you do choose to testify then some of those statements that the State is indicating that they would not be using in this trial may then come into evidence?  Do you understand that?

DEFENDANT J. GROVES: Yes, Your Honor.

THE COURT: And that would be - - well, we'd probably have a hearing to determine what or what extent those statements came in.  But do you have any questions for me concerning this issue?

DEFENDANT J. GROVES: No, Your Honor, I don't.

THE COURT: Do you feel like you understand the issues and do you feel like you have information to make that decision?

DEFENDANT J. GROVES: Yes, Your Honor.

THE COURT: All right. And, ma'am, do you understand that the decision whether to testify or you don't testify is solely your decision?

DEFENDANT J. GROVES: Yes, I do.

Appellant's trial counsel then gave opening statement as follows:

* * *

My client, Jessica Groves, was, and still is, a drug addict.  There is no doubt about that fact.  She and she alone, caused the injuries to Dylan Groves, which lead to his death.  She murdered Dylan Groves.  She will testify that she murdered Dylan Groves.  She will testify to the injuries that she caused to Dylan Groves.  The two inch fracture on the skull, the one inch fracture on the skull, the half inch laceration on the left arm, fracture of the left humerus, fracture of the left radius and ulna, red contusion on the right side of the chest, healed rib fractures and the drugs in Baby Dylan's system, these are the injuries caused to Dylan Groves by Jessica Groves.


Finally, you might ask why put everybody through this ordeal?  Why put everybody through this trauma?  The answer is because she's going to do the right thing right now.  And that right thing is to take personal responsibility for her crimes and sins.  And that right thing also is to protect and defend an innocent man.

* * * Daniel Groves had nothing to do with the death of Dylan Groves, and he did not cause these injuries.  He was foolishly unaware of these injuries.  And I say foolishly because hindsight is always 20/20, and sometimes you're oblivious to what's going on.  This is especially true for someone that you have loved.

Dylan Groves died on March 28th, and Daniel found him unresponsive.  Once he found him panic and confusion set

in.  And with that panic and confusion came poor decision and that we saw - saw here today.  Did he help hide the body?  Yes.  Did he suggest the well?  Yes.  He knew where this well was.  Did he help craft the coffin and preserve Dylan?  Yes he did.  But that is all he did.

Jessica Groves is the person responsible for the death of Dylan Groves.  She is here in front of you today taking personal responsibility for her crimes, and her sins.  Thank you, Your Honor.

Appellant's co-defendant husband's counsel's gave opening statement

as follows:

* * *

[W]e would argue and support that position in this matter that Ms. Groves is the principal perpetrator in this matter, and this is - - and the position that has actually been held by the State in this case since this case was arraigned right here in this courtroom.

* * *

That will be the position that Mr. Groves will hold. That is the position that actually Jessica Groves is going to own in this matter, as you've heard from the opening statement.

* * *

Ladies and Gentlemen, you heard my co-counsel in this matter the - - Mr. Stratton, who's representing Mrs. Groves talk about how my client participated in helping her dispose the body.  You heard Ms. Hutchinson set up here and tell you that my client actually after some misconception that he did lead the law enforcement agency to the recovery of Dylan's body.  But that's it, Ladies and Gentlemen, he only helped dispose of the body.  He did eventually cooperate with the police, because he couldn't lie about it anymore.

* * *

And I believe you will hear law enforcement come in and talk to you about that.

He led them to where Dylan had been placed.  He did not cause the - - his death.  He never kidnapped him.  He never caused his death.  He ever [sic.] endangered him.  He never interfered with custody.  He never caused harm to this child.  He cannot be the source of felonious assault that he has also been charged with.  And that's what I want you to listen for.  Either that's going to be proven or not proven throughout this case.  And it is our position that that will not be proven by the State.  That will be accounted for by the actions of Jessica Groves, and she is going to own all of those actions and she will tell you in her own words, or we anticipate her telling you in her own words, how - - whether you call it my client was blind, whether you call it that he was foolishly unaware as Mr. Stratton pointed out, he may have been, Ladies and Gentlemen, but he had no knowledge.  He had no participation.  And he was not the source of the injuries that resulted in Dylan's death.

**{¶65}** After appellant's counsel's opening statement and admission that appellant alone caused Dylan's death, and acknowledgment that appellant's co-defendant husband did not participate or cause Dylan's death, the following exchange occurred:

THE COURT: Ms. Groves, you've heard your lawyers opening statement in this matter; is that correct?

DEFENDANT J. GROVES: Yes, Your Honor.

THE COURT: All right.  We had some discussions this morning about your ultimate defense strategy in this matter.  Was that consistent with your strategy as you intend to present your defense in this matter?

DEFENDANT J. GROVES: Yes, Your Honor.

THE COURT: All right.  Have you had plenty of opportunity to consult with him about this strategy?

DEFENDANT J. GROVES: Yes, I have, Your Honor.

THE COURT: You understand that the State still has to prove their case in this matter, regardless of his opening statement?  But do you understand that potentially that - - at least in some respects in this - - Some count of this indictment could - - could harm your chances as to an ultimate outcome.  Do you understand that?

DEFENDANT J. GROVES: Yes, sir.

THE COURT: And you've contemplated this before you've proceeded with this strategy; is that correct?

DEFENDANT J. GROVES: Yes, sir.

As the appellee points out, appellant and her co-defendant both urged their counsel to employ this particular strategy so that appellant could admit culpability for Dylan's death, and to allow her husband co-defendant to only admit that he helped to conceal Dylan's body.

{¶66}  The right to effective assistance of counsel also extends to opening and closing arguments.  *Yarborough v. Gentry*, 540 U.S. 1, 5-7, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003); *Bell v. Cone*, 535 U.S. 685, 701-02, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).  As appellee notes, as a general matter both the prosecution and the defense

have "wide latitude during opening and closing arguments." *State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 22, citing *State v. Waters,* 4th Dist. Vinton No. 13CA693, 2014-Ohio-3109, ¶ 33, *Sunbury v. Sullivan,* 5th Dist Delaware No. 11CAC030025, 2012-Ohio-3699, ¶ 30; *McLeod v. Mt. Sinai Med. Ctr.*, 166 Ohio App.3d 647, 2006-Ohio-2206, 852 N.E.2d 1235, ¶ 30 (reversed in part by *Harris v. Mt. Sinai Med. Ctr.,* 116 Ohio St.3d 139*,* 2007-Ohio-5587, 876 N.E.2d 1201*),* citing *Presley v. Hammack*, 7th Dist. Jefferson No. 02 JE 28, 2003-Ohio-3280.

**{¶67}** In general, only in cases " '[w]here gross and abusive conduct occurs, is the trial court bound, sua sponte, to correct the prejudicial effect of counsel's misconduct.' " (Emphasis omitted.)  *Pesek v. Univ. Neurologists Assn., Inc.*, 87 Ohio St.3d 495, 501, 721 N.E.2d 1011 (2000), quoting *Snyder v. Stanford*, 15 Ohio St.2d 31, 37, 238 N.E.2d 563 (1968), superceded by rule on other grounds as stated in *King v. Branch Motors Express Co.*, 70 Ohio App.2d 190, 197, 435 N.E.2d 1124 (2d Dist.1980). "Moreover, counsel's behavior has to be of such a reprehensible and heinous nature that it constitutes prejudice before a court can reverse a judgment because of the behavior."  *McLeod* at ¶ 31, citing *Hunt v. Crossroads Psych. & Psychological Ctr.,* 8th Dist. Cuyahoga No. 79120, 2001 WL 1558574 (Dec. 6, 2001); *Kubiszak v. Rini's*

*Supermarket*, 77 Ohio App.3d 679, 688, 603 N.E.2d 308 (8th Dist.1991); *Redlin v. Rath*, 6th Dist. Lucas No. L-06-1144, 2007-Ohio-2540, ¶ 44.

{¶68} In the case sub judice, appellant does not claim that at trial she disagreed with, or objected to, her counsel's strategy to concede guilt during opening statement, which is a requirement for her argument that reversible error occurred. *State v. Froman,* 162 Ohio St.3d 435, 2020-Ohio-4523, ¶ 142, citing *McCoy v. Louisiana*, __ U.S.__, 138 S.Ct. 1500, 1511, 200 L.Ed.2d 821 (2018). For example, in *McCoy, supra,* the U.S. Supreme Court examined a defendant's right to control his or her defense. In *McCoy*, defense counsel conceded the defendant's guilt several times throughout the trial, despite the defendant's repeated objections. The court held that under the Sixth Amendment, a defendant retains the autonomy to decide that the defense objective is to assert innocence, much like the decisions "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and to forego an appeal." 138 S.Ct. at 1508.

{¶69} The *McCoy* court also distinguished *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), when the defendant remained silent and did not object to counsel's strategy to concede guilt. McCoy, however, clearly opposed counsel's strategy to

concede guilt and made this known "before and during trial, both in conference with his lawyer and in open court." *McCoy,* 138 S. Ct. at 1509.  Additionally, the prejudicial error analysis under *Strickland v. Washington* for counsel's ineffective assistance did not apply because this issue concerned the client's autonomy, not counsel's competence.  Consequently, because a *McCoy*-type violation constitutes structural error, a defendant need not show prejudice. In the case at bar, however, we recognize that appellant chose to remain silent about her trial strategy.  Moreover, when asked to expressly acknowledge to the trial court her approval of this particular strategy, she did so.  However, apparently in retrospect appellant now opposes this strategy.  Although this strategy may appear to be unusual, it nevertheless conformed to the appellant's wishes and sought to achieve her goal to help her co-defendant husband avoid a murder conviction.

{¶70}  Appellant also cites *State v. Owens*, 81 Ohio App.3d 412, 416-417, 611 N.E.2d 369 (4th Dist.1992) in support.  *Owens* involved DNA typing admissibility for a defendant charged with rape.  On the day of trial, defense counsel, who did not subpoena his expert witness, requested a continuance because he could not locate his expert and he argued he could not go forward without the expert. After the court denied counsel's motion for a continuance and

motion to withdraw, counsel moved for a mistrial on the grounds of his own ineffective assistance. The court, however, denied the motion, but counsel told the court he would present no witnesses for the defense and rested. *Id.* We, however, believe *Owens* is inapplicable to the case at bar. In the case sub judice, the trial court openly, fully and repeatedly discussed and questioned appellant and her co-defendant regarding their satisfaction with counsel, their ability to communicate with counsel, their opportunity to view discovery and the evidence against them, and their opportunity to discuss their cases with counsel. In fact, the court reviewed these issues multiple times at pretrial hearings on August 1, August 28, October 30, and December 18, 2019. Further, at the start of the trial, appellant's counsel stated, "My client has indicated to me that she intends to testify and that my opening statement and the statements through questioning will have to do with that testifying, and that she wants me to proceed accordingly." Once again, the trial court fully discussed with appellant her options and decisions, including whether appellant and her co-defendant understood their right to testify or not to testify, and that they could change their decision. Moreover, before appellant took the stand, she again indicated that she understood the ramifications of her testimony.

{¶71} Appellant, now, in retrospect, believes that she should have employed a different trial strategy. Although appellant's strategy to admit to the commission of a murder in an attempt to exonerate her co-defendant husband may, in hindsight, be viewed as a questionable trial strategy, an attorney who defers to a client's wishes does not generally render ineffective assistance. *State v. Reine*, 4th Dist. Scioto No. 06CA3102, 2007-Ohio-7221, citing *State v. Roberts*, 110 Ohio St.3d 71, 2005-Ohio-3665, 850 N.E.2d 1168, ¶ 148; *State v Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100; *Cowans*, 87 Ohio St.3d at 81; *see e.g.*, *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997) (deferring to client's desire not to present mitigation during penalty phase does not constitute ineffective assistance).

{¶72} The deficient performance portion of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Padilla v. Kentucky*, 559 U.S. 356, 366, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), quoting *Strickland*, 466 U.S. at 688; accord *Hinton v. Alabama*, 571 U.S. 263, 272-273, 134 S.Ct. 1081, 188 L.Ed.2d 1 (2014); accord *State v. Bradford,* 4th Dist. Adams No. 20CA1109, 2020-Ohio-4563, ¶ 18. Prevailing professional norms

dictate that "a lawyer must have 'full authority to manage the
conduct of the trial.' " *State v. Pasqualone*, 121 Ohio St.3d 186,
2009-Ohio-315, 903 N.E.2d 270, ¶ 24, quoting *Taylor v. Illinois*,
484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

**{¶73}** Moreover, and critical to this analysis, courts should
not simply assume the existence of prejudice but, instead, require
that prejudice be affirmatively shown.  *Reine* at ¶ 41, citing *State
v. Hairston*, 4th Dist. Scioto No. 06CA2089, 2007-Ohio-3707, citing
*State v. Clark*, 4th Dist. Pike No. 02CA684, 2003-Ohio-1707, ¶ 22.
Thus, even if, for purposes of argument, we believe that counsel's
actions in the case sub judice could be viewed as somewhat
misguided, we also cannot conclude that, but for counsel's errors,
the result of the trial would have been different.  Although a
strategy that includes appellant's admission that she alone caused
Dylan's death could be viewed, in hindsight, as unwise, the second
prong of *Strickland* requires a defendant to establish prejudice.
To do so, a defendant must demonstrate that a reasonable
probability exists that " 'but for counsel's errors, the result of
the proceeding would have been different.  A reasonable probability
is a probability sufficient to undermine the outcome.' "  *Hinton*,
571 U.S. at 275, quoting *Strickland*, 466 U.S. at 694; *Bradford,* 4th
Dist. Adams No. 20CA1109, 2020-Ohio-4563, at ¶ 21; *State v. Short*,

129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 91 (prejudice component requires a "but for" analysis).

**{¶74}** Thus, " 'the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' "  *Hinton*, 571 U.S. at 275, quoting *Strickland*, 466 U.S. at 695.  As noted above, courts should not simply presume the existence of prejudice but, instead, must require a defendant to affirmatively establish prejudice.  *Bradford* at ¶ 21; *Clark* at ¶ 22; State v. Tucker, 4th Dist. Ross No. 01CA2592, 2002 WL 507529 (Apr. 2, 2002).  Moreover, as courts repeatedly recognize, speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim. *Bradford, supra; State v. Tabor*, 4th Dist. Jackson No. 16CA9, 2017-Ohio-8656, ¶ 34; *State v. Jenkins*, 4th Dist. Ross No. 13CA3413, 2014-Ohio-3123, ¶ 22; *State v. Simmons*, 4th Dist. Highland No. 13CA4, 2013-Ohio-2890, ¶ 25; *State v. Halley*, 4th Dist. Gallia No. 10CA13, 2012-Ohio-1625, ¶ 25; *State v. Leonard*, 4th Dist. Athens No. 08CA24, 2009-Ohio-6191, ¶ 68; *accord State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 86 (purely speculative

argument cannot serve as the basis for ineffectiveness claim).

{¶75}  In the case sub judice, our review of the evidence adduced at trial reveals that appellee presented 20 witnesses and 79 exhibits.  The jury heard, inter alia, that: (1) appellant lacked prenatal care for Dylan because of drug use, (2) appellant was under the influence of drugs when she arrived at the hospital, (3) appellant did not comply with hospital staff requests, (4) appellant's hospital test results revealed the presence of methamphetamines, fentanyl, and opiates, (5) Dylan's umbilical cord tested positive for amphetamines, methamphetamines, fentanyl, opiates and morphine, (6) appellant showed little interest in Dylan at the hospital, (7) appellant did not comply with the SCCS case plan, (8) appellant failed to follow through with drug treatment, (9) appellant fled from law enforcement, (10) appellant lied to investigators, (11) Dylan, while born with neonatal abstinence syndrome, was otherwise healthy when he left the hospital, (12) Dylan was a victim of blunt force trauma and his cause of death was "homicidal violence of undetermined etiology," and (13) appellant and her co-defendant discussed during a jailhouse conversation the location and condition of Dylan's body.

{¶76} Consequently, after our review of the evidence adduced at trial, including the witness testimony and physical evidence, we do

not believe that appellant satisfied her burden to show that a

reasonable probability exists that, absent the alleged errors,

trial counsel's performance changed the trial's outcome and the

jury would have had a reasonable doubt about appellant's guilt.


### B.   Errors and Omissions


**{¶77}**  In addition to the challenge of trial counsel's trial

strategy to admit guilt, appellant further contends that her trial

counsel made several other significant errors that prejudiced her.


#### 1.   Failure to Obtain and Request Investigative Services

**{¶78}**  Appellant asserts that trial counsel unreasonably failed

to  request investigative services, to which she is entitled in an

aggravated murder case pursuant to R.C. 2929.024.  The version of

R.C. 2929.024 in effect at the time of appellant's trial stated:

> If the court determines that the defendant is indigent
> and that investigation services, experts, or other
> services are reasonably necessary for the proper
> representation of a defendant charged with aggravated
> murder at trial or at the sentencing hearing, the court
> shall authorize the defendant's counsel to obtain the
> necessary services for the defendant, and shall order
> that payment of the fees and expenses for the necessary
> services be made in the same manner that payment for

appointed counsel is made pursuant to Chapter 120. of the Revised Code. * * *

{¶79} "R.C. 2929.024 requires trial judges to grant funds in aggravated murder cases for investigative services and experts when 'reasonably necessary for the proper representation' of indigent defendants. Such decisions are to be made 'in the sound discretion of the court' based upon '(1) the value of the expert assistance to the defendant's proper representation * * * and (2) the availability of alternative devices that would fulfill the same functions.'" *State v. Mason*, 82 Ohio St.3d 144, 150, 694 N.E.2d 932 (1998), citing *Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264, paragraph four of the syllabus. Consequently, "due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *Id.*

{¶80} In the case sub judice, and as appellee points out, appellant does not raise specific points or arguments about what particular investigative services would have been reasonably necessary. Instead, appellant argues that her "fundamental rights were violated when trial counsel inexplicably failed to request any funding to seek investigative assistance in this matter." We, however, disagree. Here, appellant did not demonstrate a particularized need for assistance and did not establish that any denial of expert assistance resulted in an unfair trial. Moreover, as we point out in other portions of this opinion, we also believe that the evidence of appellant's guilt adduced at trial in this case is overwhelming.

{¶81} Therefore, in view of the foregoing reasons, we disagree with appellant's contention that trial counsel's failure to seek investigative assistance denied appellant her constitutional or statutory rights.


## 2. Failure to Sever


{¶82} Appellant also asserts that despite prejudicial joinder with her co-defendant's trial, her trial counsel did not request a separate trial. However, as this court wrote in *State v. Evans*,

4th Dist. Scioto No. 08CA3268, 2010-Ohio-2554, ¶ 41, as a general rule the law favors the joinder of defendants and the avoidance of multiple trials because it " 'conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries.' " *State v. Daniels*, 92 Ohio App.3d 473, 484, 636 N.E.2d 336 (1st Dist.1993), quoting *State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980); *see also State v. Goodner,* 195 Ohio App.3d 636, 2011-Ohio-5018, 961 N.E.2d 254, ¶ 39, citing *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992); *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981).

**{¶83}** To establish that a trial court's refusal to sever a trial constitutes reversible error, a defendant must show: "(1) that his rights were prejudiced, (2) that at the time of the motion to sever, he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *Schaim,* 65 Ohio St.3d at 59, citing *Torres,* 66 Ohio St.2d 340 at syllabus; *Evans* at ¶ 42. A trial court abuses its discretion when it acts unreasonably,

arbitrarily, or unconscionably. *Adams, supra,* at 157. However, a trial court's refusal to grant a severance request does not constitute an abuse of discretion when the prejudicial aspects of joinder are too general and speculative. *Evans* at ¶ 42, citing *State v. Payne*, 10th Dist. Franklin No. 02AP-723, 02AP-725, 2003-Ohio-4891.

**{¶84}** In the case sub judice, appellant complains that her trial counsel did not move to sever her case from her co-defendant's case and that the "benefits of such a motion are immediately apparent." Appellant contends that, if the court had severed the cases, defense counsel could have argued that appellee could not prove who caused Dylan's injuries. However, we once again recognize that appellant and her co-defendant explicitly expressed to counsel and to the court their wishes concerning their respective cases and their trial strategy. As we previously discussed, the court fully advised appellant before the trial began:

> THE COURT: All right. Now, early on in this case during some pretrial hearings we had some discussions here in the courtroom about whether to try these cases together or to try them separately. Do you remember those pretrial hearings we had on that, Ms. Groves?
>
> DEFENDANT J. GROVES: I do.
>
> THE COURT: And we discussed a case here in the courtroom

called *Bruton*, which deals with the issues of statements from codefendants in cases, and those statements being offered where they implicate a codefendant where someone doesn't testify.  Do you remember those discussions?

DEFENDANT J. GROVES: I do.

THE COURT: And do you feel like you understood that when we discussed that?

DEFENDANT J. GROVES: Yes, Your Honor.

* * *

THE COURT: Ms. Scott, Mr. Stratton, do you have any issues on this *Bruton* issue?  We discussed it pretty thoroughly at the pretrial hearings when we decided whether to try these cases together or separately? Anything further, Ms. Scott?

MS. SCOTT: Not at this time, Your Honor.  I believe that we have either addressed or discussed the issues and ruled any conflicts out at this time.  Thank you.

THE COURT: Mr. Stratton?

MR. STRATTON: No issues, Your Honor.

THE COURT: All right.  I am going to order the no - - at this point no statement be played to the jury that would implicate a codefendant.  We may readdress that ruling depending on what Defense portion of this case would look like.

**{¶85}**  In *State v. Rosen*, 151 Ohio St. 339, 86 N.E.3d 24 (1949), different counsel represented the defendants, as in the case at bar, but their defenses were antagonistic.  The court held, "[w]here it is disclosed, preceding the trial of codefendants jointly charged with the commission of a felony, that a signed

confession by one of the defendants, made in the absence of his

codefendants, will be put in evidence, which confession contains

statements showing the guilt of a codefendant, and based thereon an

application for separate trial is duly made by that codefendant, it

is the duty of the trial court either to grant the application or

to order the prejudicial matter withheld or deleted before

admitting the confession in evidence." *Rosen* at syllabus.

**{¶86}** As noted above, however, *Rosen* involved defendants with

mutually antagonistic defenses.  Generally, defenses are mutually

antagonistic when each defendant attempts to exculpate himself or

herself and inculpate his or her co-defendant.  *Daniels*, 92 Ohio

App.3d at 486, 636 N.E.2d 336.  In the case at bar, however,

appellant and her co-defendant did not advance mutually

antagonistic defenses.  Instead, they agreed, as their expressed

trial strategy, that appellant alone would admit that she caused

Dylan's death, and her co-defendant husband would admit only to his

participation in the disposal of Dylan's body.

**{¶87}** Further, even if the defenses appeared, for the purposes

of argument, to be mutually antagonistic, mutually antagonistic

defenses are not prejudicial per se.  *Evans,* 4th Dist. Scioto No.

08CA3268, 2010-Ohio-2554, ¶ 43, citing *Zafiro v. U.S.*, 506 U.S.

534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).  Instead, to

demonstrate prejudice that results from mutually antagonistic defenses, "the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive." *State v. Walters*, 10th Dist. Franklin No. 06AP-693, 2007-Ohio-5554, at ¶ 23, citing *U.S. v. Berkowitz*, 662 F.2d 1127, 1133 (5th Cir.1981). The essence or core of the defenses must conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other. *Walters* at ¶ 23.

**{¶88}** In the case sub judice, we recognize that both appellant and her co-defendant testified at trial, and that the essence of their testimony, that appellant alone caused Dylan's death and her co-defendant husband participated only in concealing Dylan's body, is not in conflict. Thus, we cannot conclude that counsel's failure to request to sever the cases constitutes ineffective assistance. As stated above, the trial court fully, openly and thoroughly discussed with the parties their desired trial strategy to ensure that they fully understood the ramifications of their plan. Although unusual, trial counsel did obey his client's wishes in light of the trial court's numerous warnings and admonitions that, once again, fully informed the parties of the consequences of their strategy.

{¶89} Additionally, even without appellant's, or her co-defendant's, testimony, the jury would have heard testimony and evidence that (1) appellant lacked prenatal care for Dylan due to drug use, (2) appellant was under the influence of drugs when she arrived at the hospital, (3) appellant did not cooperate with hospital staff, (4) appellant's test results revealed a positive test for methamphetamines, fentanyl, and opiates, (5) Dylan's umbilical cord was positive for amphetamines, methamphetamines, fentanyl, opiates and morphine, (6) appellant showed little interest in Dylan at the hospital, (7) appellant did not comply with the SCCS case plan, (8) appellant failed to complete drug treatment, (9) appellant fled from law enforcement, (10) appellant lied to investigators, (11) Dylan, while born with neonatal abstinence syndrome, was otherwise healthy when he left the hospital, a (12) Dylan was a victim of blunt force trauma and his cause of death was "homicidal violence of undetermined etiology," and (13) appellant and her co-defendant husband discussed during a jailhouse conversation the location and condition of Dylan's body.

{¶90} After our review, and in light of the foregoing, we conclude that appellant did not establish that she suffered prejudice from the joint trial and from counsel's failure to file a motion to sever appellant's trial from the trial of her co-

defendant.

### 3. Counsel's Assistance in Preparing
### Appellant's Testimony

{¶91} Appellant asserts that, in spite of trial counsel's opening statement that appellant alone caused Dylan's death and that she takes full responsibility for her actions, at trial and during appellant's testimony, she nevertheless appeared to be "unprepared to answer the most basic question as to how she caused any injuries to her child."

{¶92} In support of her argument, appellant cites *State v. Ikharo*, 10th Dist. Franklin No. 02AP-632, 2003-Ohio-2319. In *Ikharo,* the defendant, charged with one count of burglary, heard counsel's opening statement that Ikharo had nothing to hide and would indeed testify, in spite of his prior criminal convictions. Apparently, no physical evidence existed of forcible entry and the evidence adduced at trial was not otherwise overwhelming. Ikharo, however, chose not to testify and the jury found him guilty. The Tenth District determined that Ikharo established counsel's deficient performance because counsel disclosed Ikharo's prior convictions during opening statement when, in fact, Ikharo

subsequently chose not to testify. *Id.* at ¶ 18. Consequently, the court concluded that in light of the less than overwhelming evidence adduced at trial, a reasonable probability existed that the results of Ikharo's trial would have been different because the "evidence adduced at trial was not sufficient enough to outweigh defense counsel's deficient performance." *Id.* at ¶ 21. However, unlike *Ikharo,* after our review in the case at bar we believe that the evidence of appellant's guilt is overwhelming.

**{¶93}** Appellant also now appears to argue that at trial, she did not actually take full responsibility for her crimes, as trial counsel had promised. However, appellant did testify, in essence, in the manner that counsel laid out during opening statement. Although appellant's testimony may have been somewhat less than forthcoming, appellant did testify that she caused Dylan's death and helped her co-defendant husband conceal Dylan's body. On cross-examination, appellant did appear to be somewhat evasive or reticent in providing details concerning her actions with Dylan, and then stated it was "an accident," "not intentional," or "by dropping him." Shortly thereafter, appellant stated she was "done talking to you [the prosecutor]," accused appellee of "devouring" her family, and stated, "I've admitted to my guilt." During a bench conference, trial counsel stated, "Your Honor, I've told her

to answer truthfully and answer the questions, that she does - - does not have a right to - - to not answer questions while she takes the stand."  Later, appellant testified that she did not recall details because "my mind wasn't clear * * * because of drugs."  Appellant also admitted she wrapped Dylan in six layers of plastic and admitted that her co-defendant husband helped her, and that she and her co-defendant husband drove Dylan to the well on their four-wheeler, "[w]e put him in the well and we sit in the field and cried."

{¶94}  Although at trial appellant may have appeared to be uncooperative, and apparently refused to fully answer certain questions about various details concerning Dylan's injuries and death, she did, however, admit that she caused Dylan's death and helped to conceal his body.  These admissions occurred as trial counsel pursued the co-defendants' joint trial strategy.

{¶95}  Finally, we once again recognize the overwhelming evidence in the case at bar that far outweighs any possible mistake that counsel committed in this regard.  Thus, we cannot conclude that trial counsel's actions prejudiced appellant.


                    4.  Electing Trial by Jury

**{¶96}** Appellant asserts that trial counsel should have advised appellant to plead guilty, rather than proceed to a jury trial. Appellant points out that concessions of guilt, in any form, are among the most troublesome actions defense counsel can make, and cites *State v. Goodwin*, 84 Ohio St.3d 331, 336-37, 703 N.E.2d 1251 (1999), in support.

**{¶97}** In *Goodwin*, during a murder trial counsel conceded his client's guilt and stated that all three men (including two co-defendants) "are guilty of all charges in the indictment." *Id.* at 336. The Supreme Court of Ohio held that courts must consider a defense counsel's concession of guilt on a case-by-case basis, and, when examined within the context of the entire record of the trial proceedings, "the statements of guilt made by Goodwin's defense counsel were neither deficient nor prejudicial. The statements made did not constitute an abandonment of defense of Goodwin." *Id*. at 338. Instead, the court determined that counsel's statements appeared to have been an attempt to concede Goodwin's participation in the robbery, and to preserve the credibility of the only plausible defense theory that, in light of the strong evidence against Goodwin and despite Goodwin's participation in the robbery, he did not kill the victim. The *Goodwin* court further noted that

even assuming, arguendo, that counsel's statements may have arguably constituted deficient representation, the prejudice requirement had not been satisfied because overwhelming evidence existed against the defendant, including physical evidence and a confession.

{¶98}  Similarly, in the case sub judice we conclude that, under the unique circumstances present in the case at bar, counsel's statements and counsel's participation to permit appellant to decline to enter a guilty plea, but rather to concede guilt at trial in the hope of reducing her co-defendant husband's criminal culpability, which also undergirded her co-defendant's trial strategy, made no practical difference in the trial's result.

{¶99}  Moreover, as the appellee points out, the December 18, 2019 pretrial transcript confirms that "there have been no offers made from either side."  Thus, no evidence exists in the record of any offer, other than to plead guilty to the charges included in the indictment.  Once again, appellant adopted a trial strategy to help her co-defendant husband escape a murder conviction and to require appellee to present evidence to prove the elements of the charged crimes.

5. Meaningful Cross-Examination

{¶100} Appellant asserts that, despite having received funds for the assistance of a forensic expert to help to interpret Dr. Brown's autopsy report, trial counsel made no meaningful attempt to cross-examine Dr. Brown as to alternate possible causes of Dylan's injuries.

{¶101} In support of this proposition, appellant cites *State v. Yarber*, 102 Ohio App.3d 185, 656 N.E.2d 1322, (12th Dist.1995). In *Yarber*, after convictions of two counts of rape and one count of gross sexual imposition, the appellate court concluded that counsel provided ineffective assistance throughout the proceedings, including the failure to: (1) file a motion to suppress his confession (appellant had a third-grade education, speech-impediment, and was illiterate), (2) object to prosecutor's leading questions, and (3) question the victim regarding testimonial inconsistencies. In addition, the court observed that counsel appeared confused, made nonsensical objections, asked confusing questions, and failed to establish a coherent trial strategy. *Id*. at 1324-1325.

{¶102} Appellant contends that the case sub judice has several parallels with *Yarber.* We, however, disagree. Although trial counsel in the case at bar did not conduct an in-depth cross-

examination of Dr. Brown's autopsy report, counsel instead opted for an unusual, but coherent, trial strategy.  Pursuant to appellant's wishes, the defense strategy included appellant's decision to admit that she caused Dylan's death, while her co-defendant husband would admit that he concealed Dylan's body.  In hindsight, although this course of action may appear to be somewhat ill-advised, both appellant's counsel and co-defendant's counsel executed the precise strategy that their clients sought to advance.

{¶103} Thus, after our review, we cannot conclude that counsel's cross-examination of Dr. Brown constituted ineffective assistance of counsel.


6.  Failure to Present Mitigation Evidence at Sentencing


{¶104} Appellant asserts that trial counsel also failed to present any evidence, testimony, or make any other attempt at mitigation for purpose of sentencing.  Here, counsel's sentencing statement is as follows: "This has been a difficult matter for this entire community.  It's - - it's been shared with a lot of people. Jessica took responsibility and I just asked the court to consider that in sentencing."

{¶105} Appellant now argues that trial counsel failed to (1) seek any possibility of parole, (2) explore, or even mention, the possibility of post-partum depression, and (3) call witnesses or present evidence in mitigation.

{¶106} Appellant points to *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) in support. Williams, convicted of robbery and capital murder and sentenced to death, argued that he had been denied the effective assistance of counsel when counsel failed to investigate and failed to present substantial mitigating evidence to the sentencing jury. The court determined that counsel failed to: (1) conduct an investigation that would have uncovered "extensive records graphically describing Williams' nightmarish childhood, not because of a strategic calculation but because they incorrectly thought that state law barred access to such records," (2) introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond the sixth grade, (3) seek prison records regarding appellant's commendations for his assistance in prosecuting a prison drug ring and returning a guard's missing wallet, and (4) present testimony from a prison ministry volunteer who offered to testify regarding Williams' good behavior in prison. The court concluded these omissions "clearly demonstrate that trial counsel did not fulfill their obligation to

conduct a thorough investigation of the defendants' background."
*Id.* at 395-396.  More important, however, and absent in the case
sub judice, is that the *Williams* court also concluded that a
reasonable probability existed that the result of the sentencing
phase would have been different if the jury had heard that
evidence.

**{¶107}** In the case sub judice, after our review we cannot
conclude that appellant has shown that the trial court's sentence
would have been different had counsel presented additional
mitigation evidence.  Here, the trial court, prior to sentencing,
had access to appellant's competency evaluation, which detailed her
substance abuse history and her motivation to "feign deficits in
her legal knowledge."  The report also indicated that appellant did
not show symptoms suggestive of a severe mental illness, and that
her "presentation and history are suggestive of an underlying
personality disorder complicated by her substance abuse.  Further,
she appeared to be psychiatrically stable during the assessment,
and testing revealed evidence of exaggerating or feigning
psychiatric difficulties."  The assessment further revealed that
appellant is "of average intellect, with no history of an
intellectual disability," that appellant graduated from high school
and obtained training and employment in the healthcare field.

**{¶108}** A trial counsel does not necessarily render ineffective assistance by deferring to a client's desire to not present mitigation evidence. The Supreme Court of Ohio has held that "a defendant is entitled to decide what she [or he] wants to argue and present as mitigation in the penalty phase, see, e.g., *Jenkins*, 15 Ohio St.3d at 189, 15 OBR 311, 473 N.E.2d 264, citing *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973, including the decision to present no evidence." *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 140. Thus, an attorney who declines to present evidence in mitigation, in deference to a client's desire, does not render ineffective assistance. *Id.* at ¶ 148, citing *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100; *Cowans*, 87 Ohio St.3d 68, 81, 717 N.E.2d 298 (1999); *Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997). *See also State v. Armor*, 2017-Ohio-396, 84 N.E.3d 181 (10th Dist.) (no deficient performance for failure to present mitigation evidence when record did not show what information investigation would have revealed and whether such information could have aided defendant.)

**{¶109}** While in the case sub judice we cannot discern from the record what discussions may, or may not, have occurred between appellant and trial counsel regarding this issue, we believe that

appellant did not establish prejudice arising from counsel's failure to present mitigating evidence at sentencing.  The trial court heard the evidence, including appellant's trial testimony, and had access to appellant's competency evaluation materials.  We therefore do not believe that appellant's trial counsel's actions constituted a deficient performance.

{¶110} Accordingly, after our review and based upon the foregoing reasons, we overrule appellant's assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed. Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of 60 days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the 60-day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the 45-day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.