[Cite as *State v. Carver*, 2022-Ohio-3223.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

STATE OF OHIO,                              :
                                           :         Case No. 21CA3943
    Plaintiff-Appellee,                :
                                           :
    v.                                 :         <u>DECISION AND JUDGMENT</u>
                                           :         <u>ENTRY</u>
MARY BETH ANN CARVER,                       :
                                           :
    Defendant-Appellant.               :

<u>APPEARANCES</u>:

Valerie M. Webb, The Law Office of Valerie M. Webb, LLC, Portsmouth, Ohio, for Appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay Willis, Assistant Prosecuting Attorney, Portsmouth, Ohio, for Appellee.

Smith, P.J.

{¶1} Mary Beth Ann Carver appeals the March 12, 2021 Judgment Entry of the Scioto County Court of Common Pleas. Carver was convicted by a jury of several counts of endangering children, one count of felonious assault, and one count of obstructing official business. The trial court imposed a minimum prison term of 14 years to an indefinite maximum prison term of up to 18 years. On appeal, Carver's sole assignment of error asserts that her trial counsel rendered ineffective assistance during the evidentiary portion of her trial. Based on our

review of the record, we find Carver's claim of ineffective assistance to be without merit as we do not find her counsel rendered deficient performance. Accordingly, we overrule the sole assignment of error and hereby affirm the judgment of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

{¶2} Carver is the natural mother of three minor children subject of these proceedings, A.C.G., (born in 2019); M.C.G., (born in 2018); and I.C.G., (born in 2016). On August 28, 2020, Carver was indicted by the Scioto County Grand Jury on six counts which included endangering children, felonious assault, and obstructing official business. The indictment stemmed from an incident occurring on August 15, 2020 on Greenbriar Road. On that date, Carver, who was covered in blood and behaving erratically, was observed walking down the road with three nearly naked children, also covered in blood. Counts One through Four alleged Carver endangered children resulting in serious physical harm. Count Five alleged felonious assault. Count Six alleged obstructing official business, creating a risk of physical harm to her three minor children, emergency medical squad (EMS) personnel, and law enforcement officers.[1] The circumstances surrounding these allegations are set forth below.

---

[1] The State of Ohio later moved to amend the indictment in order to correct errors in properly identifying the names and dates of birth of the three children named as victims. The trial court granted the motion.

{¶3} On August 31, 2020, Carver pled not guilty at her arraignment. Carver's attorney subsequently filed a motion for a competency evaluation. On October 28, 2020, the parties stipulated to the qualifications of Dr. Gail M. Hellman to conduct a competency evaluation and to the findings of her competency report in which she opined that Appellant was competent to stand trial and did not meet the criteria necessary to enter a plea of not guilty by reason of insanity. Based on the parties' stipulation, the trial court found Carver competent to stand trial. After additional pretrial discovery and proceedings, Carver proceeded to jury trial on March 8, 2021.

{¶4} The State of Ohio called 17 witnesses which included a 911 dispatcher; three eyewitnesses at the Greenbriar Road scene; Scioto County Sheriff's deputies; Scioto County Detective Jodi Conkel; EMS personnel; and medical personnel from Southern Ohio Medical Center (SOMC). Many of these witnesses provided substantially similar testimony in that upon arrival at the scene they encountered an uncooperative woman who was bleeding profusely, children terrified and covered in blood, and a lifeless infant. Several witnesses described the scene they encountered as "traumatic"; "a scene from a horror film"; "a scene from *Carrie*"; "a massacre scene"; and "a scene from *The Walking Dead*."

{¶5} Don Scott, a resident of Greenbrier Road, testified that in July 2020, Carver, his niece, began living in the camper about 50 feet from his house. The

camper did not have electricity or running water. Carver ran an extension cord from the camper to Scott's house to provide electricity. Scott testified "they had a cheap breaker plugged into my breaker box. When they got too much power it would shoot [sic] off * * * and they'd have to come back over and click it back on." Scioto County Sheriff's Deputies Ethan Carmichael, Logan Shuff, and Craig Ashley later testified that the inside of Carver's camper was unsanitary: filled with dirty dishes, trash, food on the floor, and possibly feces.

{¶6} Scott testified that on August 15, 2020, Carver had been at his house twice trying to use his phone. At one point Carver seemed angry and threw his phone so he told her to leave. Scott testified he has a prosthetic leg and uses a walker. He was afraid Carver would hurt him because she "gets so loud and frightening." Scott testified that he refused to let her in and thereafter she broke his window. Scott testified, "Just wasn't in her right mind, I reckon." On cross-examination, Scott admitted that he locked the door and ordered Carver to leave. He also admitted that after the window was broken, he told her to "get the F off my porch."

{¶7} Jessica Lauder testified her parents live on Greenbriar Road. On August 15, 2020, she stopped by their home on her way to school. Lauder was sitting in her car in her parents' driveway when she heard a commotion coming

from up the road.  She testified she glanced in her passenger mirror and saw a

woman walking up the road.  Specifically, Lauder testified:

> She has this infant in like a chokehold and the baby is dangling down and its head's up here.  It looks almost lifeless to me.  And an older child walking beside her, and they're all covered in blood.  The babies are naked.  And then come to find out, there's another in between child in the ditch on the other side of the road.  And it's screaming and crying.  And [Carver] comes up and she's—blood—pouring down the side of my vehicle because she leans against my vehicle.

{¶8} Lauder testified she was alarmed because she thought the baby

was dead.  Its eyes were rolling in its head.

{¶9} Lauder continued, "[Carver] proceeded to ramble on and tell me

that she needs help for her kids, and then she tells me that somebody robbed

her."  Lauder described Carver's demeanor as "flinging the baby around

back and forth, rocking around, and she's pacing along, and then flinging

herself against the side of my vehicle."  Lauder testified she took a picture of

the situation because, "I figured, you know, in the situation that it might be-

- somebody else needed to see what was truly going on, because it-- -it was

like a horror film.  Like, it was terrible. * * * Very traumatic."

{¶10} Lauder identified and authenticated State's Exhibits 3 and 4, a

picture of her cell phone and a paused image she took of the scene.  Lauder

testified she called 911 as soon as Carver came over to her vehicle.

{¶11} Lauder described the older two children as traumatized. The middle child was crying. The oldest wouldn't talk. Lauder gave Carver a blue blanket for the baby, which Carver did not use. Lauder identified State's Exhibit 7, a photograph of the baby lying on a blanket in the sun and drenched in blood. Lauder testified when EMS and law enforcement arrived, multiple people were trying to calm Carver. Carver was "flopping around" and kicking at the officers while they tried to apply a tourniquet to stop her bleeding.

{¶12} On cross-examination, Lauder testified Carver asked for help. When Lauder was asked why she called 911 rather than immediately get out of her car to help, Lauder testified that she had no protection and she did not want to make contact with the blood. She was actually studying phlebotomy at the time.

{¶13} April Pierson, a 911 Dispatcher employed by the Scioto County Sheriff's Office, testified regarding the 911 calls. Specifically, a female neighbor called advising that "a lady was walking down the road with kids, that there was blood all over them." The caller advised that "the lady told her she had been robbed." Don Scott's and Jessica Lauder's 911 calls were played for the jury.

{¶14} Jack Hayes, Jessica Lauder's father, testified he was mowing grass in his back yard when one of his dogs alerted him. In response, Hayes

went towards the front of the house and saw a "young woman with a baby in a chokehold in her arm, laid back on the ground, just flopping around like a fish out of water * * *." The baby was described as "bluish-grey looking, very pale, lifeless" looking as if it was dead. Carver was not supporting the baby's head with her other arm. Carver was making unintelligible sounds and blood was gushing everywhere.

{¶15} Hayes saw two other little girls, one across the road in the ditch, half-naked, screaming and crying. Hayes retrieved the little girl from the ditch. Hayes testified when the paramedics arrived, "they got out and they worked with her and finally got the baby away from her." Hayes also testified he did not interact closely with Carver because she was covered in blood, he has health issues, and did not have protection.

{¶16} Trent Adams testified he is a certified paramedic for the Minford squad with about 32 years' experience in EMS. As an advanced paramedic he can start intravenous support and give drugs. Adams received a page for an unknown, "someone covered in blood." He testified it took about seven minutes to arrive at the scene on Greenbriar Road. Once there, he encountered a woman and three naked kids covered head to toe in blood, "a scene from *Carrie*." Adams testified:

> She was holding the baby. There was the two kids upset. I'm
> not sure where the blood was coming from. She was holding the

baby kind of like a ragdoll. We was trying to get the baby away from her to see where all the blood was coming from, and she was not cooperating, just kind of talking out of her head, acting erratic. So we was trying to get control of her and figure out, you know, how to stop any bleeding or even find out where all she was hurt. * * * [The baby was] kind of listless. Like a ragdoll. You could tell it—it was breathing, but it was not fighting screaming, it was just more or less limp.

{¶17} Adams and his EMS partner asked for backup because multiple people appeared injured. When deputies arrived, they tried to restrain Carver because she was combative, uncooperative, resisting treatment. Ultimately, Adams learned that Carver had an injury to her left elbow area.

{¶18} EMS personnel and several deputies from the Scioto County Sheriff's Office also arrived on the scene to provide assistance to Carver and the children. Deputy Ethan Carmichael testified when he first arrived at the scene a squad member was attending a woman bleeding profusely. Three small children under the age of four were covered in blood, without clothing. An infant lying on the ground appeared lifeless. The woman's demeanor was agitated and she would not stand still.

{¶19} As part of his investigation, Deputy Carmichael later went to SOMC to check on the other children. They seemed terrified, wouldn't talk to him, and tried to hide their faces. He also spoke to Don Scott the next day and identified State's Exhibit 11, the broken window. He also identified State's Exhibit 12 and 13, photographs of the interior of the camper.

{¶20} James Owens, a part-time minister and certified emergency medical responder, and Donna Hurt, a basic EMT, testified that they volunteered with Clay Squad 11. Mr. Owens drove to Greenbrier Road and once there, they observed "blood everywhere." Someone handed the baby to Donna Hurt. He assessed the older children. They realized the baby needed transport so he wrapped it in a blanket and carried it to the squad. The older children went too.

{¶21} Donna Hurt requested a medic for assistance and Darrell Mershon, a paramedic on Clay Squad 12, responded. Owens and Hurt met Mershon at the Clay Township station. Mershon jumped in and immediately determined the baby should be transported by helicopter to Cabell Huntington (West Virginia) Hospital.

{¶22} Darrel Mershon testified as to his efforts to stimulate the lifeless baby. It appeared she was not breathing at all. The baby was "bagged" in order to get it to breathe. He explained that a facemask is put over a person's face. A bag is attached to the mask and the bag is continually squeezed in order to try to force oxygen into the person's lungs. Mershon estimated the baby was unresponsive for approximately ten minutes.

{¶23} Mr. Owens also testified as he drove the ambulance to meet the helicopter at Lute's Supply Company on U.S. Route 23 in Rosemount, Donna Hurt yelled to Mr. Owens: "Hey Rev, we need some prayer back here!" Darrel

Mershon testified when they reached the helicopter landing zone, he continued to bag the baby.

{¶24} Julia Gearhart, a fireman and squad member with Squad 11 testified that when she was dispatched she went to the fire department and got a fire truck to set up the helicopter landing zone. As soon as she began setting up the zone the squad pulled in. She opened the back doors and observed Donna Hurt bagging the baby and Darrel Mershon trying to start an IV. Mershon asked her to take the other children to SOMC. As Donna Hurt was removing the children to the other squad, she heard the baby crying. She testified that everybody expressed great relief.

{¶25} Gearhart was shocked to see the nonresponsive children covered in blood. While the children were transported to SOMC, Gearhart brushed glass off their skin. Jessica Lauder also rode in the ambulance with the two older children.

{¶26} Michael Kinskey, a flight paramedic, testified when he climbed into the back of the ambulance at the landing zone the infant was crying. He testified he attempted several times to place an IV in the baby. Finally, the baby was given Lidocaine so he could drill through its tibia in order to administer drugs or fluid in case the baby went unresponsive again during the flight to the hospital. Fortunately, the baby did well on the flight.

{¶27} Michael Mader, a registered nurse at SOMC, noted that Carver was covered in blood, disoriented, and uncooperative. Karissa Couch, a nurse practitioner designated an expert in emergency medicine, testified the older girls were bloody, naked, and unengaged, not even speaking to each other. Ms. Couch opined that the girls suffered mental shock.

{¶28} Dr. Tucker, an ER physician at SOMC, testified that Carver suffered "acute delirium from drugs," possibly methamphetamine. On cross-examination, he also acknowledged that her behavior could be mental illness. Importantly, Nurse Mader, Dr. Tucker, and several other witnesses also admitted that there were no drug screens or lab work in Carver's medical records which indicated positive finding for drug use. However, Dr. Tucker explained that to order urine testing would have been invasive and prolonging.[2] Carver was transported to Grant Hospital in Columbus, Ohio because SOMC does not have a trauma unit.

{¶29} Finally, on behalf of the State of Ohio, Detective Jodi Conkel of the Scioto County Sheriff's Office testified that during her investigation of the incident other individuals informed her that Carver used Xanax and methamphetamine. Conkel testified that she interviewed Carver. Conkel's interview with Carver was

---

[2]The inference appears to be that to drug test Carver would take time and given her medical condition for extensive bleeding and the uncertainty as to the extent of her injuries, the doctor felt that she should be transported immediately.

played for the jury. During the interview, Carver gave incorrect birth dates for two of the children. Carver told Conkel she did not want to release the baby and lay her on the ground because there were two big dogs nearby. She stated that she only knocked on Scott's window and accidently broke it. Carver did admit using one Xanax.

{¶30} Conkel also testified she reviewed Carver's jail phone calls. In one phone call, Carver admitted that she got angry, lost her temper, and broke the window glass, contrasting with her interview statement. On cross-examination, Conkel admitted that as part of investigative strategy, she lied to Carver during the interview.

{¶31} All the State's exhibits were admitted into evidence. Defense counsel made a Crim. R. 29 motion for acquittal, arguing the State had failed to prove the element of serious physical harm. The trial court denied the motion. The defense presented three witnesses, including Carver.

{¶32} During her testimony, Carver explained that when she broke the window it was an accident, as she was knocking on the window to get her uncle's attention. The electric had gone out several times on August 14th and again on August 15th. The camper did not have air conditioning and she was using fans to cool herself and the children. Also, the children were not wearing clothing in an

effort to stay cool.  She testified they were all in extreme distress and desperate need of having the electric restored.

{¶33} Carver also testified that after she accidentally broke the window, she was holding the baby and the two younger ones were standing near her.  As such, blood ended up on all of them.  Carver walked down the road and sought help from Jessica Lauder who not only refused to help but also began taking video on her cell phone.  Lauder's father also provided no help.  Eventually Lauder called 911 and gave Carver a blanket for the baby.  Carver testified, however, that two large dogs were circling her and for that reason, she was afraid to lay the blood-covered infant on the ground.  The defense also offered several exhibits which were admitted into evidence.

{¶34} After deliberation, Carver was found guilty by a jury on all of the following counts:

Count 1:  Endangering Children in violation of R.C. 2919.22(B)(1) and 2919.22(E)(2)(d), a felony of the second degree, the violation resulting in serious physical harm to A.C.G.

Count 2:  Endangering Children in violation of R.C. 2929.22(A) and 2919.22(E)(2)(c), a felony of the third degree, the violation resulting in serious physical harm to A.C.G.

Count 3:  Endangering Children in violation of R.C. 2919.22(A) and 2919.22(E)(2)(c), a felony of the third degree, the violation resulting in serious physical harm to M.C.G.

Count 4: Endangering Children in violation of R.C. 2919.22(A) and 2919. (E)(2)(c), the violation resulting in serious physical harm to I.C.G.

Count 5: Felonious Assault, in violation of R.C. 2903.11(A)(1) and 2903.11(D)(1)(a).

Count 6: Obstructing Official Business, in violation of R.C. 2921.31(A) and 2921.31(B), creating a risk of physical harm to three minor children, EMS personnel, and law enforcement officers at the scene.[3]

{¶35} Carver was sentenced on March 10, 2021, immediately following the verdict. The trial court found that Counts One and Five merged for the purpose of sentencing. The court further found that Count Two did not merge with Count One, and that Counts Three and Four did not merge with each other. Finally, the court found that Count Six was a completely separate offense not subject to merger.

{¶36} Appellant was sentenced as follows: On Counts One and Five as merged, a minimum prison term of eight years to an indefinite maximum prison term of up to 12 years; on Count Two, a prison term of 12 months; on Count Three, a prison term of 24 months; on Count Four, a prison term of 24 months; and on Count Six, a prison term of 12 months. The trial court further ordered that all sentences be served consecutively with each other, for a total net sentence of a

---

[3]While the State of Ohio moved to amend the indictment to correct the children's names and birthdates, the court's entry granting the motion indicated the children's surname was the same as Carver's. In the appealed-from judgment entry, the children's names are listed with a "G" as the final initial, indicating the father's surname.

minimum prison term of 14 years, to an indefinite maximum prison term of up to

18 years.

{¶37} This appeal followed.

## ASSIGNMENT OF ERROR

I.    APPELLANT'S TRIAL COUNSEL WAS
      INEFFECTIVE IN HIS REPRESENTATION OF
      APPELLANT BY COMMITTING SEVERAL
      ERRORS DURING THE TRIAL OF
      APPELLANT'S CASE.

## A. STANDARD OF REVIEW

{¶38} Carver contends that her conviction should be reversed based on

ineffective assistance of counsel.  Carver argues that her trial counsel made a series

of errors that prejudiced her.  Specifically Carver argues that her trial counsel

failed to make objections during the State's case to:  (1)  leading questions during

the testimony of Jessica Lauder; (2) improper and speculative opinion testimony of

State's witness Jack Hayes; (3) improper "expert" testimony of Trent Adams; and

(4) improper "expert" testimony of Deputy Ethan Carmichael.  To establish

constitutionally ineffective assistance of counsel, a criminal defendant must show

(1) that his or her counsel's performance was deficient and (2) that the deficient

performance prejudiced the defense and deprived him or her of a fair trial.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 (1984).  Accord *State*

*v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d

123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "Failure to establish either element is fatal to the claim." *State v. Jones*, 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14.

{¶39} When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland* at 689, 104 S.Ct. 2052. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Quotation omitted). *Id.* " 'A properly licensed attorney is presumed to execute his [or her] duties in an ethical and competent manner.' " *State v. Taylor,* 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, quoting *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 61.

{¶40} "Furthermore, courts may not simply assume the existence of prejudice, but must require that prejudice be affirmatively demonstrated." *State v. Walters,* 4th Dist. Washington Nos. 13CA33, 13CA36, 2014-Ohio-4966, ¶ 24; *State v. Jones,* 2018-Ohio-239, 104 N.E.3d 34, ¶ 21-24 (4th Dist.). We have repeatedly recognized that speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim. *E.g. State v. Dailey,* 4th Dist. Adams No. 18CA1059, 2018-Ohio-4315, ¶ 33 and cases cited therein. *State v. Thacker,* 4th Dist. Lawrence No. 19CA18, 2021-Ohio-2726, ¶ 54-57.

LEGAL ANALYSIS

{¶41} Generally, a defendant has no constitutional right to determine trial tactics and strategy of counsel. *See State v. Groves,* 4th Dist. Scioto No. 20CA3904, 2022-Ohio-443, at ¶ 58; *State v. Cowans,* 87 Ohio St.3d 68, 72, 717 N.E.2d 298 (1999); *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 150. " 'When there is no demonstration counsel failed to research the facts or the law or counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter.' " *Crank* at ¶ 18, quoting *State v. Clayton,* 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

{¶42} At trial, witness presentation, questioning and cross-examination usually falls within the ambit of trial strategy. Debatable trial tactics do not generally establish ineffective assistance of counsel. *See Groves, supra; State v.*

*Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45. " '[T]he

failure to object to error, alone, is not enough to sustain a claim of ineffective

assistance of counsel. To prevail on such a claim, a defendant must first show that

there was a substantial violation of any of defense counsel's essential duties to [the

defendant] and, second, that [the defendant] was materially prejudiced by counsel's

ineffectiveness.' " *State v. Moore,* 4th Dist. Pickaway No. 20CA10, 2021-Ohio-

4414, at ¶ 15, quoting *State v. Holloway,* 38 Ohio St.3d 239, 244, 527 N.E.2d 831

(1988). Additionally,

> Experienced attorneys "learn that objections to each potentially
> objectionable event could actually act to their party's detriment.
> * * * In light of this, any single failure to object usually cannot
> be said to have been error unless the evidence sought is so
> prejudicial * * * that failure to object essentially defaults the case
> to the state. Otherwise, defense counsel must so consistently fail
> to use objections, despite numerous and clear reasons for doing
> so, that counsel's failure cannot reasonably have been said to
> have been part of a trial strategy or tactical choice." (Omissions
> sic).

*State v. Johnson,* 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140,

quoting *Lundgren v. Mitchell,* 440 F.3d 754, 774 (6th Cir. 2006).

1. <u>Jessica Lauder's Testimony.</u>

{¶43} On direct examination, Ms. Lauder testified as to her observations

when Carver came into the Hayes' driveway. On cross-examination, Carver's

attorney suggested Carver's fear for herself and her children due to the presence of

two large unrestrained dogs on the Hayes' property as a reason for Carver's

excitement and failure to lay the baby on the blanket.  The testimony elicited from Lauder on cross-examination demonstrated that there were two large dogs behind a wireless fence and Carver would not have known they were prevented from harming her or the baby due to the Hayes' wireless fence.

{¶44} Carver asserts that on redirect examination, the prosecutor used leading questions concerning the location of the dogs, the invisible fence, and the absence of any threat to Carver from the dogs.  Carver argues that her attorney rendered deficient performance due to her attorney's failure to object to the leading nature of these questions.  " 'A leading question is "one that suggests to the witness the answer desired by the examiner." ' " *State v. Huff,* 4th Dist. Scioto No. 14CA3596, 2015-Ohio-5589, at ¶ 41, quoting *State v. Diar,* 120 Ohio St.3d 460, 900 N.E.2d 565, 2008-Ohio-6266, ¶ 149, quoting 1 McCormick, Evidence (5th Ed.1999) 19, Section 6.  Evid.R. 611(C) states in part that, "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." *See State v. Thacker,* 4th Dist. Lawrence No. 19CA18, 2021-Ohio- 2726, at ¶ 63.

{¶45} To begin our analysis, we go to the exchange set forth in the trial transcript.  Specifically, Carver's attorney questioned Lauder as follows:  "And did it ever cross your mind that the reason she didn't put the kid down was because of the dogs in the yard?"  Lauder responded that "[T]here was too much going on

than worry about dogs." Carver's attorney continued: "But the dogs might attack, or the dogs might come after the kids considering that they're covered in blood?"

{¶46} On redirect, Lauder testified as follows:

Q:    You were asked about your parents (inaudible) and dogs?

A:    Yes.

Q;    And are those dogs vicious at all?

A:    No.

Q:    Okay. You said they were - - had shock collars on and had a wireless fence perimeter?

A:    Yes.

Q:    Okay. And the dogs were inside the fence perimeter.

A:    Yes.

Q:    The Defendant, the bloody woman is outside the fence perimeter?

A:    Correct.

Q:    So the dogs weren't circling around her (inaudible) - -

A:    No.

Q:    --were they?

A:    No. They weren't there growling at her and everything.

Q:    Posing no threat whatsoever?

A:    No.

{¶47} Upon our review of the trial transcript, we reject appellant's claim that trial counsel performed ineffectively by failing to object to leading questions. Evid.R. 611(C) does not preclude the use of leading questions on direct examination; instead, the rule provides that "it is within the trial court's discretion to allow leading questions on direct examination." *State v. Jackson,* 92 Ohio St.3d 436, 449, 751 N.E.2d 946 (2001). Accordingly, " 'the failure to object to leading questions does not constitute ineffective assistance of counsel.' " *State v. Carroll,* 4th Dist. Ross No. 15CA3506, 2016-Ohio-7218, at ¶32, quoting *Jackson,* 92 Ohio St.3d at 449.

{¶48} More importantly, whether or not Carver feared the dogs seems irrelevant or a sub-issue at best, not a material issue pertinent to the outcome of her convictions for endangering children. Scott testified that Carver broke his window and was "creating a scene" at his home even before she walked to the Hayes' driveway and encountered dogs. Jessica Lauder and her father testified that upon their initial encounters with Carver, she was holding the baby in a chokehold and it appeared lifeless. She and the children were covered in blood. One of the older girls was crying. Jack Hayes testified that even after the squad arrived the paramedics had difficulty getting the baby away from her.

{¶49} Carver testified that the dogs were circling her and because of the blood she feared placing the baby on the blanket on the ground. Even if Carver's

testimony was to be believed, the overwhelming evidence supporting conviction for child endangering is that Carver was holding her baby in a chokehold as she approached he driveway. She did not immediately allow others to take the child and care for it. Even if Carver feared the dogs, holding the baby in a chokehold and not allowing others to immediately treat it was what endangered the baby.

{¶50} The overwhelming testimony from several witnesses also demonstrates that the older children appeared traumatized and, as Karissa Couch opined, suffered from mental shock. If Carver had properly controlled her actions by not breaking the window and getting blood on the children, behaving erratically, and carrying the baby as she did, perhaps the older girls would not have suffered mental shock. These are her actions supporting the allegation that she endangered her older children. Whether or not she feared the dogs does not seem pertinent to the outcome of the trial.

{¶51} The trial court had discretion to allow leading questions. In this case, the questions were not material to the outcome of the case. To allow the prosecutor to ask these questions was expeditious in a case where approximately 20 witnesses were to be called to testify. "It is well-established that '[c]ompetent counsel may reasonably hesitate to object [to errors] in the jury's presence because objections may be considered bothersome by the jury and may tend to interrupt the flow of a trial.' " *State v. Miku,* 2018-Ohio-1584, 111N.E.3d 558, at ¶ 65 (5th

Dist.), quoting *State v. Rogers*, 9th Dist. Summit No. 19176, 1999 WL 239100,

citing *State v. Campbell*, 69 Ohio St.3d 38, 53, 630 N.E.2d 339 (1994) (internal

quotations omitted).

{¶52} Based on the foregoing, we do not find counsel's performance to be

deficient for a failure to object to leading questions. The failure to object did not

prejudice Carver. Even if counsel had objected it would not have changed the

outcome. Carver's argument is not well-taken.

2. Trent Adams' Testimony.

{¶53} For ease of analysis, we next consider Carver's assertion that Adams'

testimony was objectionable. During his testimony Adams testified he gave

Carver multiple doses of Haloperidol and Versed, both intermuscular and through

an IV, an unusual amount. After they got to ten of each drug, it was "pushing the

limits" of how much can be administered. Adams testified that, based on his 32

years' experience and his designation as an advanced paramedic, the basis of her

erratic and uncooperative behavior, was "usually drug-induced." He also testified

that her behavior was like that he had seen recently, due to "stuff we've never

really seen before, but you can tell it's a combination – one of the new drugs."

Adams estimated Carver's weight at 100-112 pounds and testified it took four

deputies and two EMS personnel to restrain her.

{¶54} Carver asserts that although Trent Adams was not qualified as an expert witness, he was permitted to state his opinion that her behavior was due to illicit drug use as to the basis for Carver's behavior while being treated. Carver's attorney failed to object to this testimony. Carver argues his trial attorney should have objected to this testimony and ask that it be stricken from the record.

{¶55} The trial court has broad discretion in the admission or exclusion of evidence. *See State v. Fannon,* 2018-Ohio-5242, 117 N.E. 3d 10, supra, at ¶ 65 (4th Dist.); (internal citations omitted). " '[A]buse of discretion' [is] an 'unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken.' " *State v. Kirkland,* 140 Ohio St. 3d 73, 2014-Ohio-1966, 15 N.E. 3d 818, at ¶ 67, quoting *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23. Since the adoption of the Rules of Evidence, both on the state and federal levels, many courts have used an Evid.R. 701 analysis and have allowed lay witnesses to testify about, for example, the identity of a drug. *See State v. Meddock,* 2017-Ohio-4414, 93 N.E.3d 43, at ¶ 8 (4th Dist.); *State v. Johnson*, 4th Dist. Gallia No. 2014-Ohio-4032, at ¶ 38; *State v. McKee,* 91 Ohio St.3d 292, 744 N.E.2d. 737 (2001). Evid.R. 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the

witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.

[C]ourts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702 * * *. Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they will fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

*Johnson, supra*, at ¶ 38.

{¶56} Furthermore, "lay witness opinion testimony is not prohibited 'merely because it embraces the ultimate issue to be decided by the trier of fact.' " *State v. Infante,* 11th Dist. Trumbull No. 2019-T-0043, 2020-Ohio-992, at ¶ 42, quoting *State v. Heilman,* 11th Dist. Trumbull Nos. 2004-T-0133, 2004-T-0135, 2006-Ohio-1680, ¶ 96, citing Evid.R. 704.  "[T]he critical point is whether the opinion of the lay witness will truly be helpful to the jury * * *." *State v. O'Brien,* 11th Dist. Lake No. 2011-L-011, 2013-Ohio-13, ¶ 45.

{¶57} In the case at bar, we do not think counsel's failure to object and request that Trent Adams' opinion testimony be stricken constitutes deficient performance.  Mr. Adams was testifying as to his observations of Carver's demeanor and conduct when he arrived at the scene.  He administered large doses

of the sedatives Haloperidol and Versed.  Six people were trying to restrain her in order to determine the nature and extent of her injuries.  We find Adams' lay opinion, based upon his personal knowledge and 32 years' experience as a paramedic, was appropriate under Evid.R. 701.

{¶58} Furthermore, " '[a] competent trial attorney might well eschew objecting * * * in order to minimize jury attention to the damaging material.' " *State v.  Canterbury,* 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 70, (internal citations omitted), quoting *United States v. Payne,* 741 F.2d 887, 891 (7th Cir. 1984).  Carver's trial counsel likely wished to downplay and minimize Adams' testimony, anticipating the introduction of the SOMC emergency room records containing Dr. Tucker's medical opinion diagnosing Carver with "drug-induced delirium" based on her presentation.  Dr. Tucker also later testified that Carver was agitated and uncooperative and that patients like this can be suffering "acute delirium from drugs."  Given the fact that the jurors would be hearing similar testimony later at trial from a trained and experienced medical doctor, we do not see how allowing Adams' testimony earlier changed the outcome of the trial.  Consequently, we do not find merit to this argument.

3. Jack Hayes' Testimony.

{¶59} Jack Hayes also described his observations regarding the actions

of the EMS personnel who treated Carver at the scene. Hayes testified when the

paramedics arrived they got the baby away from Carver and tried to apply a

tourniquet on Carver's arm. Specifically, he testified:

> Before they could even get a tourniquet on her arm I guess they gave her some kind of sedative or something. * * * They tried to calm her down and she was just going nuts on them. They tried to set her up there on my mower and they got it covered in blood. I know it was at least three or four of them, maybe five, before they even got a tourniquet on her * * *. And they gave her, like I said, some kind of sedative or something there to try to calm her down and she was just irate * * *.

{¶60} Carver asserts that Hayes was not qualified to know exactly what the

EMS were doing to treat Carver, therefore, his statement indicating she received a

"sedative or something" was mere speculation. Because Carver's attorney failed to

object to this statement, Carver argues that his performance was deficient.

{¶61} Here, we also find Jack Hayes' testimony to be permissible under

Evid. R. 701. The jury was aware that Mr. Hayes was not testifying as an expert.

He testified as to his firsthand observations and he did not testify that Carver in

fact received a sedative.

{¶62} Furthermore, defense counsel likely anticipated that Trent Adams'

later testimony would be that he gave Carver five doses of Haloperidol

intramuscularly, "basically a sedative," and then five additional doses of another

sedative, Versed, through an IV. Because Carver did not calm down, he gave her

another five doses of Versed. The jury properly heard this testimony, based on

Adams' firsthand observations.  Even if trial counsel had objected to Mr. Hayes'

testimony, it would not have changed Trent Adams' testimony later in the trial that

he did administer sedatives, nor would it have changed the outcome of the trial.

Based on the foregoing, we find no merit to Carver's argument herein.

4.  Deputy Ethan Carmichael's Testimony.

{¶63} Deputy Carmichael testified that Carver was in an "excited delirium

state of mind" caused by use of methamphetamine.  Carver's attorney failed to

object to this line of questioning even though Carmichael was also not determined

to be an expert witness.  Thus, Carver argues that this omission constitutes

deficient performance.  We disagree.

{¶64} Specifically, Deputy Carmichael testified that he has come in contact

with people acting like Carver in the past.  He testified:  "Usually they are "under

the influence of some kind of narcotic.  I believe this one would be the - - under the

influence of methamphetamine, based on her delirium, agitation, and sweating. * *

* She was sweating pretty bad."   Deputy Carmichael opined that she posed a risk

to her own children.

{¶65} In *State v. Meddock,* 2017-Ohio-4414, 93 N.E.3d 43, at ¶ 27-28 (4th

Dist.), we found that an officer's testimony regarding the one-pot method of

methamphetamine production was properly admitted under Evid.R. 701.  The

officer, Corporal Cottrell, testified regarding the process used to manufacture

methamphetamine and the materials commonly used for that process. His testimony was based on his training, certification, and experience of identification of clandestine methamphetamine labs. His testimony was also based upon his observations at the scene of Appellant's arrest in April 2015. We concluded that Corporal Cottrell's testimony was proper lay opinion well within the providence of the rule.

{¶66} Likewise, we observe that a proper foundation was laid concerning Deputy Carmichael's training on identification of persons under the influence of illegal substances and his almost daily experience with individuals under the influence of drugs and/or alcohol. Deputy Carmichael specifically testified as to his three-year law enforcement experience and training at the Southern Ohio Police Academy, where he had extensive training on how to identify people under the influence of drugs. He testified he encounters people under the influence almost daily. When he arrived at the scene he saw two squad members assisting a female who was bleeding profusely. The female's demeanor was aggressive and agitated, she was screaming, and would not stay still for treatment. She eventually fell to the ground and had to be restrained. We find Deputy Carmichael's opinion was rationally based upon his perceptions upon arrival at scene. We find his lay opinion was proper under Evid. R. 701.

{¶67} Even if trial counsel had objected, it would have only called attention to this unfavorable testimony. As previously indicated, defense counsel likely anticipated Dr. Tucker's testimony that Carver's "acute delirium" could be from drugs, and "the one that comes to mind is methamphetamine." We fail to see how counsel's objecting to Deputy Carmichael's opinion testimony would have changed the outcome of Carver's trial. Consequently, we find this argument is also without merit.

CONCLUSION

{¶68} Based on the foregoing, we find no merit to the arguments raised under Carver's sole assignment of error. Carver was indicted for endangering children, not use or possession of drugs. While there was no record of positive drug testing in Carver's medical records on the date of the incident, Dr. Tucker's opinion testimony and the SOMC record suggested that drug use was responsible for her agitated and uncooperative behavior which caused her endangerment of her three young children. Had trial counsel objected to leading questions or alleged improper opinion evidence, we do not find the outcome of the trial on allegations of endangering children would have changed.

{¶69} The overwhelming admissible evidence demonstrated that Carver intentionally broke a window and created a scene at her uncle's house with her children watching; caused her own profuse bleeding that covered the children in

blood; carried her infant in a chokehold to the point that it appeared lifeless and required medical treatment to breathe; and failed to seek immediate attention for the physically injured baby and emotionally traumatized older girls. The jury found this evidence credible in finding her guilty of endangering children.[4]

{¶70} And while we need not consider both prongs of an ineffective assistance of counsel analysis, we find counsel's performance was not deficient and further find that Carver was not prejudiced by counsel's performance. Accordingly, the sole assignment of error is hereby overruled.

**JUDGMENT AFFIRMED.**

---

[4]The jury also apparently found Carver's testimony about the incident lacking in credibility. The jury heard evidence of Carver's jail phone calls in which she admitted to intentionally breaking Scott's window. The jury also heard Jessica Lauder's testimony that when Carver first approached, she claimed she had been robbed, along with a 911 call in which Jessica Lauder advises April Pierson, the dispatcher, that "She told me she was robbed." Despite Carver's erratic and uncooperative behavior, she apparently had the presence of mind to concoct a story that she was robbed.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and Appellant pay all costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Wilkin, J. concur in Judgment and Opinion.

For the Court,

_____

Jason P. Smith
Presiding Judge

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**